COMMONWEALTH *vs.* PETER GROOME.

Barnstable. January 9, 2001. - October 5, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Evidence,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Motion to suppress, Instructions to jury, Capital case. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Homicide.*

In a murder case, the evidence supported the judge's subsidiary findings of fact and ultimate conclusions, including the conclusions that the defendant was not in custody as of his initial encounter with the police and that there was no interrogation of the defendant during that initial encounter, so that there was no basis on which to suppress statements made to the police at that time; that certain conversation with the police in a police vehicle was not the product of any custodial interrogation and therefore was properly admitted; and that further conversation with the police at a State police barracks occurred while the defendant was still not in custody and that failure to give Miranda warnings therefore did not require suppression of any of his statements to that point in the interview. [210-215]

Where a criminal defendant's inquiry to police officers for an attorney occurred at a point well prior to the commencement of any custodial interrogation, the officers, to whatever extent (if any) they should have interpreted the defendant's inquiry as an actual request for an attorney, were not required to honor that request or cease talking to the defendant. [215-216]

In a murder case, the defendant knowingly and voluntarily waived his right to remain silent where, although the waiver was verbal, the defendant's reluctance to sign the form offered by police officers did not require that the motion judge's crediting of the officers' testimony about the defendant's verbal waiver be set aside, and where the officers had not extended improper pressure, promises, rewards, or inducements to make the defendant talk. [216-219]

At a murder trial, the judge was not required to instruct the jury on voluntary manslaughter, where the evidence presented did not support a theory of voluntary manslaughter. [219-222]

INDICTMENT found and returned in the Superior Court Department on December 30, 1997.

A pretrial motion to suppress evidence was heard by *Elizabeth J. Dolan,* J., and the case was tried before *Gerald F. O'Neill, Jr.,* J.

*Catherine K. Byrne*, Committee for Public Counsel Services, for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree (committed with deliberate premeditation and extreme atrocity or cruelty).[1] On appeal, the defendant argues that his confession should have been suppressed and that the judge erred in not instructing the jury on voluntary manslaughter. He also asks that we exercise our power under G. L. c. 278, § 33E, to reduce the verdict or grant him a new trial. We decline to reduce the verdict or order a new trial, and affirm the conviction.

1. *Facts.* On Monday morning, December 8, 1997, the body of the defendant's girl friend, Elsie Korpela, was found underneath an automobile in the driveway of her home in Hyannis. After initial statements to the police that afternoon denying knowledge of or involvement in the victim's death, the defendant ultimately gave the police a full and detailed confession. Prior to trial, he moved to suppress both his earlier statements and that confession. After a three-day evidentiary hearing, the motion to suppress was denied in its entirety. The motion judge's findings are as follows.

Police arrived at Korpela's home at 9:23 A.M. after a passerby had spotted a body lying underneath a Chevrolet Cavalier automobile. The Chevrolet was registered to the defendant. Korpela's own vehicle, a black Volvo automobile, was missing. Relatives told the police that Korpela had been particularly attached to the Volvo, and that she had never loaned it to anyone or let anyone else drive it. Based on that information, the police treated the vehicle as stolen. Relatives also told police that the defendant was Korpela's boy friend, and that one Keith Davis was her former boy friend. State Trooper John Kotfila and Barnstable police Detective Sean Balcom were dispatched to try to locate the defendant, while another officer was sent to find Davis.

After checking at the defendant's residence, the police were

---

[1] A second conviction of unauthorized use of a motor vehicle was placed on file with the defendant's consent and is not before the court on appeal. See *Commonwealth* v. *Powell*, 433 Mass. 399, 399 n.1 (2001).

advised that the defendant worked as a teacher's aide at a residential school in Middleborough. Kotfila contacted State police in Plymouth, asking that they go to the school to try to locate the defendant and the missing vehicle. Lieutenant Robert Kelliher and Detective Bruce Gordon, wearing plain clothes and driving an unmarked cruiser, proceeded to the school. Kelliher and Gordon went into the administration building to ask for the defendant, while another trooper in a separate vehicle looked for the Volvo.

School personnel contacted the defendant, and he came out to meet with the officers. Kelliher and Gordon explained that they had been asked to find him, and that two other officers were coming from Cape Cod (Cape) to talk with him about a missing black Volvo.[2] They asked the defendant for his license and identification, which he provided. The defendant then volunteered that he had traded cars that day with his girl friend so that she could take his car for an oil change at a shop in Hyannis. He also told the officers that he had been with his girl friend in New York over the weekend. The officers did not question him, but merely engaged in small talk while waiting outside the building for other officers to arrive.[3] At one point, the defendant went back into the administration building to get water or use the bathroom. He was not accompanied by either officer when he did so.

Meanwhile, another trooper had found the Volvo parked elsewhere on school grounds. He radioed that discovery to Kelliher, who told him to remain with and secure the vehicle.

After the defendant had waited and chatted with Kelliher and Gordon for about twenty minutes, Kotfila and Balcom arrived. They told the defendant that they were investigating a stolen Volvo.[4] The defendant told Kotfila and Balcom, as he had told Kelliher and Gordon, that he had the Volvo, and that he had arranged to swap cars with his girl friend so that his car could be

[2]They did not tell the defendant that the inquiry also included a homicide.

[3]Kelliher and Gordon had essentially no involvement in or knowledge about the case. Their role was limited to finding the defendant and informing the officers who were involved in the case that he had been located.

[4]Again, the officers did not tell the defendant that they were investigating a homicide.

taken for an oil change. Kotfila asked the defendant if he would accompany them back to the Cape so that "any problem about the car could be straightened out." The defendant agreed to go with them. Although no handcuffs had been produced or suggested by any of the officers, the defendant asked that the officers not put him in handcuffs in front of the schoolchildren. Kotfila responded to the defendant's request by telling him that he was not under arrest.

The ride to the Cape took about forty-five minutes. En route, the officers noticed that the defendant had an accent and asked him where he was from. The defendant explained that he was from Ireland, and the three chatted about Ireland for a while. There was no questioning about the Volvo or about Korpela.[5]

The defendant arrived at the Yarmouth State police barracks at around 2:30 P.M., where he was met by Trooper John Mawn and Barnstable police Detective James Tamash. Mawn, Tamash, and the defendant proceeded to a second-floor room that served as both an interview room and the officers' lunch room. The room was furnished with a table and chairs, along with some kitchen appliances (including a refrigerator and a microwave oven). Mawn thanked the defendant for coming to talk with them, and then asked the defendant to wait briefly while he completed some paperwork.

Mawn and Tamash began interviewing the defendant at around 2:50 P.M. They asked for some personal background information, which again led to a discussion of the defendant's home country. The defendant then asked to use the bathroom. Mawn gave him directions, and the defendant went to the bathroom unaccompanied. On his return, Mawn offered him a soft drink from the supply in the refrigerator. The defendant

---

[5]At the hearing, the defendant testified that Kotfila talked to Balcom about a seminar he had been to concerning forensic evidence, claiming that he had learned about new techniques by which fingerprints could be recovered from cement blocks. In light of the fact that a cinder block with blood stains and hair had been found next to the victim's body, one could view such a remark as an attempt to prompt the defendant to talk about the crime. However, at the time, the defendant did not make any connection between the officer's remark and his own predicament, and it generated no response from him. The motion judge did not make any finding as to whether she credited the defendant's testimony, concluding that, even if made, the remark was of no consequence.

chose a beverage, and the three engaged in some conversation unrelated to the case. The defendant again asked to use the bathroom, and again went and returned unaccompanied by any officer. When he returned to the room, the defendant asked Mawn and Tamash if he "had to stay here." Mawn replied that they were not the "British Army," that he was not a suspected "Irish Republican Army collaborator," and that they could not make him stay. Mawn said that they did want to ask him some questions, but that he was free to go.

The defendant did not leave. In an apparent attempt to get to the point of the interview, the defendant said that the officers who drove him down had said something about a problem with the car. The defendant then, for the third time, volunteered his version about trading vehicles so that his girl friend could take his car for an oil change while he used her car to get to work. Mawn told the defendant that Korpela's relatives believed that the Volvo had been stolen, hence the investigation of a stolen vehicle. The defendant questioned why Korpela herself had not reported the vehicle missing and asked the officers why they had not talked to Korpela. At that point in the interview, somewhere between 3:15 P.M. and 3:30 P.M., Mawn told the defendant that Korpela was dead.

On hearing this news, the defendant became visibly shaken, and he began trembling and gagging. He again asked to use the bathroom, and again went there unaccompanied. He was still quite shaken on his return. He asked to smoke, which Mawn allowed. His hands were trembling such that he had difficulty lighting the cigarette himself, and Mawn ultimately helped him light it.[6]

The defendant asked the officers if he needed a "solicitor." Mawn queried, "What do you mean?" The defendant replied that the term "solicitor" meant "attorney," explaining that "we call them solicitors where I come from." Mawn then told the

---

[6]Mawn testified at the motion hearing that he found nothing suspicious in the defendant's emotional reaction to the news of his girl friend's death. Noting that he had had to deliver death notices before, he testified that the defendant's distress at such news "wasn't anything different than a normal reaction."

defendant that he was not under arrest, was not charged with anything, and therefore did not need an attorney.[7]

Mawn then asked the defendant about his activities with Korpela the previous evening. The defendant replied that he and Korpela had traveled to New York for the weekend, returning to the Cape by dinnertime. They had enjoyed dinner at a restaurant and gone to a bar, and then returned to Korpela's house. He again described the planned trade of vehicles so that Korpela could take his car to get the oil changed the next day. Pursuant to that plan, the defendant said that he had left Hyannis in Korpela's Volvo that night and driven to his residence in West Barnstable. Mawn asked the defendant if he knew of anyone who would have wanted to hurt Korpela. The defendant replied that she had had some problems with her prior boy friend, Keith Davis, and also mentioned another man named "Tom," who had been her boy friend before that.

At a little before 4 P.M., Mawn was called out of the interview room, and the defendant left for another unaccompanied trip to the bathroom. Mawn spoke with another trooper who was working on the investigation, who informed Mawn that blood spat-

[7]At the hearing, both Mawn and Tamash testified that the defendant made no reference to a "solicitor" or an "attorney" at any time during the interview. The defendant testified that he made repeated requests for an attorney at various points during questioning. The motion judge credited some, but not all, of the defendant's testimony on this issue. The described exchange about the use of the term "solicitor" — the method by which the defendant raised the subject — was deemed credible. The motion judge's findings place this inquiry as occurring "upon his arrival or shortly thereafter at the barracks," without any greater specificity as to when during the interview it occurred. However, the defendant's testimony consistently placed the reference to a "solicitor" as occurring for the first time just after being advised of Korpela's death. He characterized that point as "just shortly after I got there." There is no suggestion in the record that the inquiry about a "solicitor" occurred at any earlier point during the interview.

At oral argument, defense counsel contended that there was no basis for the judge to have found that the defendant inquired whether he "needed" an attorney, because the only evidence was that the defendant had "asked for" an attorney. The motion judge was not required to credit the defendant's characterization of his inquiry. From Trooper Mawn's response (i.e., that he did not "need" an attorney because he was not under arrest or charged with anything), the judge could infer that the actual contents of the defendant's inquiry had been whether he "needed" an attorney.

ters had been found on the Volvo.[8] With that information, Mawn decided to arrest the defendant. He returned to the interview room, told the defendant that "[w]e have a problem," and confronted him with the discovery of blood on the Volvo. Mawn explained that the blood meant that the Volvo was probably at the scene at the time of the murder, and that it was a "serious problem" for the defendant because it was inconsistent with the version the defendant had given. As a result, Mawn said that he would have to read the defendant his rights.

Mawn read the defendant the standard Miranda warnings from a form, then handed the form to the defendant to read. Mawn asked if he understood his rights; the defendant replied that he did; and the defendant signed the upper portion of the form acknowledging that his rights had been read to him.[9] The time of that signature was noted as 4:11 P.M. The defendant also stated that he would talk to the officers. The second portion of the form, entitled "Waiver," was then presented to the defendant for his signature. Despite his earlier verbal statement that he was willing to talk to the officers, the defendant did not sign the waiver at that time. Mawn explained that they could not talk to him without his signature on the waiver. The defendant responded, "I don't know what to do." Mawn asked him if he understood, to which the defendant replied that he understood and that he did want to talk with them, but also stated that he was "unsure of what to do."

Mawn then asked the defendant about his level of education. The defendant explained that he had dropped out of school in Ireland at around age fifteen, but was presently pursuing his GED through a school facility nearby to the State police barracks. Apparently satisfied that the defendant understood what they were talking about, Mawn again told the defendant

[8]Possible blood spatter had been observed on the vehicle when it was still at the school, and the vehicle had been inspected by crime laboratory personnel after it was impounded. At some point, officers on the Cape had been informed of this development. The motion judge credited Mawn's testimony that it was not until the break in the interview shortly prior to 4 P.M. that he first knew anything about blood on the vehicle.

[9]The motion judge noted that the defendant had been arrested before for operating a vehicle while under the influence of alcohol, and that a lawyer had been appointed for him on that occasion. She found that the defendant understood his rights, and the defendant does not contest otherwise.

that if he wanted to talk to them, he needed to sign the waiver portion of the form. The defendant replied, "You think I did it don't you?" Mawn told him, "I think that you're involved in it." The defendant began to gag with dry heaves, to the extent that the officers handed him a wastebasket.

The defendant then remarked that he would never see his mother again, and that "this would kill her." He told the officers that his family was "religious," and that "[t]his will be very hard on them." He asked the officers about their families and whether they were religious. He noted an Irish ring on Mawn's finger, and began asking him about his last name and his Irish heritage. He told Mawn that he had had a schoolteacher with that same name, relating an incident from his childhood involving that teacher. He began talking about the county where the name came from, remarking that the Irish Republican Army had strong ties to that county. The defendant again asked to use the bathroom. This time, he was accompanied by one of the officers.

When he returned, the defendant asked what was going to happen. Mawn told him that he was under arrest for murder, and that he would be booked, photographed, and fingerprinted. The defendant asked for and was given another soft drink. He asked where he was going to be held. Mawn told him that he would be held at either the barracks or a house of correction, and he again asked the defendant if he would sign the waiver. The defendant said he was still unsure. However, the defendant himself continued to talk. He told the officers, "You must think I'm an animal." Mawn replied that it was not up to them to judge. The defendant then commented that he was "really a decent guy." He launched into a description of his friends, his activities with them over the Thanksgiving holidays, and how they were helping him get a job at an Irish bar.

At that point, with no signed waiver, Mawn told the defendant that he and Tamash had "better things to do" on the investigation, and that if the defendant did not want to talk to them, he should say so directly or ask for an attorney. The defendant still expressed reluctance to sign, but at the same time continued talking to the officers. He then asked the officers if he could go outside for a walk. Mawn replied that it "would benefit no

one" to do that because they could not talk to him without a signed waiver.[10]

The defendant thereupon signed the waiver portion of the form, noting the time as 5:17 P.M., more than one hour after having been read his rights. The officers then took the defendant outside for a walk without handcuffs or other restraints.[11]

The three walked down Route 28. The defendant asked to go buy cigarettes. They went to a pharmacy in a shopping complex, where the defendant purchased his cigarettes. Outside the store, the defendant lit a cigarette and remarked, "This is probably my last cigarette." Walking back toward the barracks, the defendant observed, "This will probably be my last walk for a long time." As they approached the barracks, the defendant stated, "I won't lie to you guys anymore. I killed her." Mawn said that he would take the defendant's statement when they got inside.

They went back to the interview room, at which point the defendant made a detailed confession. He explained that Korpela had gotten drunk the night before, and that they were up in her bedroom arguing about their relationship. He stated that Korpela told him that she had AIDS and herpes, and that he probably did as well. She yelled at him, slapped him in the face, and pulled at his sweatshirt. The defendant went downstairs to leave, but could not find his car keys, either inside the house or outside with the car. Korpela followed him

---

[10]The clear import of this exchange was that the officers would take the defendant for his requested walk only if he signed the waiver. Having just explained that they "needed to move on" and "had other matters that [they] needed to attend to," Mawn related the discussion as follows: "If we were to go for a walk with you, we really still can't discuss what we need to discuss and therefore it would be taking us away from other things that we have to attend to." Elsewhere, Mawn described the conversation in similar terms: "I had just explained to him that Detective Tamash and I needed to move on to some other things and that by going for a walk, it would be of no benefit to anyone, we could better spend our time attending to those other matters rather than walking." The defendant recalled the response to his request for a walk in the same fashion: "They said a walk wouldn't be of any benefit to anyone if I didn't sign the form," "[h]e told me it would be to no one's benefit if we went for a walk unless I signed that," and the reason the walk would be of no benefit was that "they couldn't talk to me" without the signed waiver.

[11]Both Mawn and Tamash acknowledged that, in their experience, such an outing with a person under arrest for murder was unprecedented.

downstairs and then outside, carrying a "tool" or "chisel" in her hands. She placed the object on the roof of her Volvo, then leaned inside the vehicle looking for the defendant's keys. She was yelling that the defendant was "using her" and that "all men are the same." The defendant, standing outside the car, picked up the tool and struck Korpela. She fell to the ground. The defendant struck her again approximately fifteen times in the head and face once she was down on the ground. She was still moaning. Wanting the sound "to stop and go away," the defendant picked up a concrete block and threw it down on her. He then went inside to wash his hands. He came back out and moved his Chevrolet on top of Korpela, but then could not find the keys to her Volvo. He drove back off of her and got the keys to the Volvo from Korpela's body. He then drove his own vehicle up over her again to hide the body. He retrieved the murder weapon, and drove off in Korpela's Volvo. Stopping on an unknown side street, he discarded the murder weapon.[12]

The defendant drove home, washed, and laundered the clothes he had been wearing. The next morning, he went to work driving Korpela's Volvo. At school, he placed calls to Korpela's employer, pretending to ask for her. He also placed a call to Korpela's home telephone, leaving a message on her machine about having tried to reach her at work, the plan for the oil change, and his ostensible intent to meet her at the bar later that afternoon. At some point during the school day, he had gone out to the Volvo and had noticed some spots of blood on the window. He got a sponge from one of the classrooms and wiped them off. He claimed that he had recognized the vehicle being driven by Gordon and Kelliher as a police vehicle, and "knew it was for [him]."

The statement was reduced to writing, then reviewed and signed by the defendant at approximately 9:30 P.M. There was no tape recording of any portion of the interview or any portion of the defendant's statement.

2. *Motion to suppress.* The defendant contends that he was in custody from the moment the police met him at the school; that police failed to give him Miranda warnings prior to their initial

---

[12]Efforts to locate the weapon were unsuccessful, despite the defendant's later assistance with the search.

questioning of him; that the earlier statements must be suppressed for failure to give Miranda warnings; and that the statements made after being advised of his rights must be suppressed as fruit of the poisonous tree. With respect to the confession he gave after receiving Miranda warnings, the defendant also argues that his waiver was not voluntary, that the officers interfered with his access to counsel, and that his subsequent confession must be suppressed on those alternative grounds.

When reviewing a motion to suppress, we "accept a motion judge's subsidiary findings of fact and give substantial deference to [her] ultimate conclusions, if they are supported by the evidence." *Commonwealth* v. *Parker*, 402 Mass. 333, 339 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995). However, "where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review. Our appellate function requires that we make our own independent determination on the correctness of the judge's 'application of the constitutional principles to the facts as found.' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977), *S.C.*, 398 Mass. 806 (1986), quoting *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977). We conclude that the motion judge's subsidiary findings of fact and ultimate conclusions are supported by the evidence, and that she correctly applied the applicable constitutional principles to the facts she found.

a. *Custodial interrogation of the defendant.* We agree with the judge's conclusion that the defendant was not in custody as of his initial encounter with the police and that there was no interrogation of the defendant during that initial encounter. A person is in custody whenever he is "deprived of his freedom of action in any significant way." *Commonwealth* v. *Haas, supra* at 551, quoting *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). "The crucial question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody. . . . Thus, if the defendant reasonably believed that he was not free to leave, the interrogation occurred while the defendant was in custody, and Miranda warnings were required" (citations omitted). *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). In assessing the circumstances, the court considers several factors: (1) the

place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest. *Commonwealth* v. *Morse*, 427 Mass. 117, 121-127 (1998). *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984).[13]

Applying these factors to the encounter between the defendant and the officers who came to locate him at the school, we conclude that the defendant was not subjected to any custodial interrogation at that time. The place (the defendant's place of employment) was neutral. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 452 (1980). The officers did nothing to communicate to the defendant any impression that he was a suspect in any crime, but merely that there were officers who wanted to talk to him about a missing vehicle.[14] See note 13, *supra.* As to the nature of the interrogation, there was no questioning beyond the

[13]The second factor had previously been described as "whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect." *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). That factor has since been modified to reflect that an officer's subjective suspicions are relevant to the custody inquiry only if those suspicions have been communicated to the defendant. *Stansbury* v. *California*, 511 U.S. 318, 323-324 (1994). *Commonwealth* v. *Morse*, 427 Mass. 117, 123-127 (1998). The focus of the inquiry is on the objective circumstances of the interrogation, *id.*, and, to the extent that a person being questioned is led to believe that he is a suspect, that could objectively cause him to think that he was not free to leave. By comparison, unarticulated suspicions contribute nothing to the objective circumstances of the encounter. *Stansbury* v. *California, supra* at 324.

[14]The police clearly wanted to locate the defendant and speak to him promptly. He was the victim's boy friend, and his car had been found on top of the victim's body. However, the police had no information to suggest that there was anything amiss in the defendant's relationship with the victim — her family had relayed no such information — and only the car itself provided any possible connection to the defendant. To whatever extent the officers in charge of the investigation harbored suspicions about the defendant, Kelliher and Gordon (who had no substantive involvement in the investigation and no

request to see a license and identification. Beyond that, Kelliher and Gordon merely told the defendant that some other officers wanted to speak to him about a missing vehicle and, while waiting for those officers to arrive, engaged the defendant in small talk. The defendant volunteered the story about trading vehicles with his girl friend so she could take his car for an oil change. The contours of the discussion with Kelliher and Gordon were left entirely up to the defendant.[15] Throughout the time waiting for the arrival of the officers, the defendant was free to end the discussion and free to leave. Indeed, he went back into the school building unaccompanied by either of the officers. The motion judge's conclusion that the defendant was not in custody is amply supported, and there is no basis on which to suppress the statements made to Kelliher and Gordon.

After Kotfila and Balcom arrived from the Cape, the defendant agreed to accompany them back to the Cape and rode with them for some forty-five minutes. The motion judge's conclusion that the defendant was not in police custody during that trip is again supported by the record. Although the place (a police vehicle) was not entirely neutral, the defendant was expressly told before he got into the vehicle that he was not under arrest. His fear that he might be in custody (which the motion judge properly ascribed to his own feelings of guilt, not to anything the police did or said) was addressed by Kotfila, when he told the defendant that he was not being arrested. The defendant then went with the officers voluntarily. See *Commonwealth* v. *Duguay*, 430 Mass. 397, 400-401 · (1999)

---

knowledge of its details) did not communicate any such suspicions to the defendant.

[15]A person in custody is not entitled to Miranda warnings unless he is subjected to interrogation. *Commonwealth* v. *Torres*, 424 Mass. 792, 796-797 (1997). "Miranda warnings are only required when 'a person in custody is subjected to either express questioning or its functional equivalent.' " *Id.*, quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 300-301 (1980). The "functional equivalent" of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* Kelliher and Gordon did nothing "reasonably likely to elicit an incriminating response" from the defendant. *Id.* Thus, even if he were in custody while waiting at the school, the lack of Miranda warnings would not lead to the suppression of the statements that the defendant volunteered to the officers during that time.

(defendant who agreed to accompany officers to station was not in custody during trip). Again, nothing was said by the officers to suggest that the defendant was a suspect in any crime.[16] There was no interrogation during the trip.[17] The only incriminating statement made by the defendant was his repetition of the version of events he had already volunteered to Kelliher and Gordon, i.e., the explanation about trading vehicles with his girl friend so she could take his car for its oil change. The conversation in the vehicle on the way back to the Cape was not the product of any custodial interrogation and therefore was properly admitted.

From the time of his arrival at the barracks up until Mawn confronted him with the information about blood having been found on the Volvo, the defendant was still not in custody. Although the barracks would not be viewed as a neutral place, the fact that an interview takes place at a police station "does not, in itself, brand an interrogation as custodial." *Commonwealth* v. *Gil*, 393 Mass. 204, 212 (1984), quoting *Commonwealth* v. *Bookman*, 386 Mass. 657, 660 (1982). The defendant was not treated as if he were in custody. Rather, he was thanked for coming and was repeatedly allowed to leave the room unescorted. The investigation was still not focused on the defendant as a suspect, and nothing was done to suggest to the defendant that he was viewed as a suspect of any crime.[18] The tone was informal and almost casual, including a considerable amount of small talk about matters unrelated to any

---

[16]Indeed, there was still no mention of any homicide, let alone that the defendant was suspected of such a crime. The defendant was told only that they were investigating a possible "stolen vehicle," and, as to that potential crime, the defendant had already given Kelliher and Gordon a perfectly plausible explanation as to why he had his girl friend's Volvo. The officers had described the trip to the Cape as a measure to "straighten[] out" the "problem," suggesting that they viewed the matter as some form of misunderstanding or miscommunication.

[17]Assuming that Kotfila did make some remark about the ability of experts to take fingerprints from cement blocks, and that he did so knowing it was "reasonably likely to elicit an incriminating response," *Commonwealth* v. *Torres, supra*, the defendant made no response to that remark.

[18]The defendant was asked if he knew of anyone with any motive to harm Korpela, suggesting again that the defendant himself was not a suspect, but only being questioned for information that might help uncover the actual perpetrator.

investigation. There was very little questioning of the defendant until he was advised of Korpela's death.[19] Finally, the defendant was free to leave and was expressly told that he was free to leave. When he asked if he could leave, Mawn told him that they wanted to talk to him but had no power to detain him (including a joking reference that they were not the "British Army" questioning a suspected "Irish Republican Army collaborator"). To whatever extent anything else about the interview would have made a reasonable person think that he was not free to leave, any such mistaken impression was dispelled by Mawn's correct explanation of the defendant's actual status. The motion judge correctly determined that the defendant was still not in custody and that failure to give Miranda warnings therefore did not require suppression of any of his statements to that point in the interview.

b. *Interference with right to counsel.* The conclusion that the defendant was not in custody is dispositive of the defendant's contention that the police improperly refused his "request" for an attorney.[20] At that point in the interview, the defendant had no constitutional right to counsel. The right to counsel guaranteed by the Sixth Amendment to the United States Constitution does not attach until the initiation of formal adversary proceedings (see *Davis* v. *United States*, 512 U.S. 452, 457 [1994]; *United States* v. *Gouveia*, 467 U.S. 180, 188 [1984]), and formal proceedings against the defendant were obviously not yet under way. The right to have a lawyer present during custodial interrogation is a prophylactic measure designed to protect rights under the Fifth Amendment to the United States Constitution, not a right accorded by the Fifth Amendment itself. Rather, the right to counsel is one of a

---

[19]Even that questioning led only to the recitation of the same story concerning the car swap and planned oil change, plus some innocuous detail about how the two had been to New York for the weekend and had dined and gone out for a drink on their return Sunday night. The information obtained by the police during this time frame was essentially cumulative of what the defendant had already told to other officers.

[20]As discussed above (see note 7, *supra*), the judge found that the defendant did not "request" an attorney, but rather only inquired of the officers whether he "needed" one. The officers' response — that he did not "need" one because he was not charged with anything and not under arrest — was improper advice, and is not conduct that we condone. See note 21, *infra*.

"series of recommended 'procedural safeguards' . . . [that] were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Davis* v. *United States, supra,* quoting *Michigan* v. *Tucker,* 417 U.S. 433, 443-444 (1974). These procedural safeguards were adopted to combat the "inherently compelling pressures" of custodial interrogation "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona,* 384 U.S. 436, 467 (1966). Thus, at the time the defendant inquired whether he "needed" a lawyer, the Miranda warnings — including its prophylactic imposition of a right to counsel during custodial interrogation — had not yet attached. A person who is not being subjected to custodial interrogation is free to stop talking with the police and free to leave, whether for the purpose of consulting counsel or for any other reason, but that person does not have any right to counsel unless and until the interview becomes custodial. Here, the defendant's inquiry about an attorney occurred at a point well prior to the commencement of any custodial interrogation. Thus, to whatever extent (if any) the officers should have interpreted the defendant's question as an actual request for an attorney, they were not required to honor that request or cease talking to the defendant.[21]

c. *Voluntariness of waiver.* Once Mawn learned of the blood

[21]While there was no Miranda violation, we do note with disapproval that the officers' advice about the defendant not "needing" an attorney because he had not been arrested or charged was misleading, and, in all likelihood, deliberately so. Police deception can, if sufficiently egregious, eviscerate the voluntariness of any subsequent statement. See *Commonwealth* v. *Jackson,* 377 Mass. 319, 326-329 (1979); *Commonwealth* v. *Dustin,* 373 Mass. 612, 613, 615 (1977), cert. denied, 435 U.S. 943 (1978). Here, however, the defendant's inquiry did not amount to any articulation of a desire not to speak to the officers, and his continued conversation with them (which contained nothing of substance that had not already been voluntarily disclosed by the defendant to other officers) was not in any sense involuntary. By the time the defendant made his confession, he had been advised of his right to counsel and had been asked whether he wanted counsel. By that time, he had also been told that he was charged with and under arrest for murder. In other words, the prior explanation as to why he did not "need" counsel was clearly no longer operative. While we do not condone the misleading advice that Mawn originally gave the defendant, the officers did not profit from that

that had been discovered on the Volvo, he did decide to arrest the defendant. From that point on, the defendant was in custody. Immediately on Mawn's return to the interview room, he advised the defendant of what he had learned, told him that that was a "serious problem," and proceeded to read the defendant his Miranda rights. The defendant acknowledged then, and does not dispute on appeal, that he did understand his rights. He contends, however, that his waiver of those rights was not made voluntarily.[22] The record supports the motion judge's determination that his waiver of rights was voluntary.

The motion judge found that, on being read his rights, the defendant stated verbally that he was willing to speak with the officers. Although he hesitated when asked to sign the waiver in documentary form, he repeatedly stated that he would talk with Mawn and Tamash. Moreover, the defendant himself continued to initiate conversation with the officers. Some of that conversation was irrelevant to the case (e.g., tales of the defendant's childhood in Ireland), but other remarks initiated by the defendant confirmed a willingness to talk about the case itself (e.g., the defendant's statement to the officers, "You must think that I am an animal," and his question, "You think I did it, don't you?"). The issue is whether the defendant knowingly and voluntarily waived his right to remain silent, not whether he was willing to provide the officers with signed documentation of that waiver. For purposes of any future motion to suppress, police officers understandably want their compliance with constitutional requirements documented in writing wherever

---

misleading advice in any fashion that would now mandate suppression of the defendant's statements.

[22] He does not separately argue that the confession itself was involuntary. "The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors." *Commonwealth* v. *Edwards*, 420 Mass. 666, 673 (1995). There is no suggestion on this record that the confession itself — blurted out spontaneously by the defendant while walking back to the barracks without any question being posed by the officers — was anything other than voluntary. The confession followed a protracted period during which the defendant himself had initiated conversation with the officers on various topics, both relevant and irrelevant to the case. We see no infirmity in the judge's conclusion that the defendant's statements were made voluntarily.

possible.[23] However, the absence of written confirmation does not vitiate a valid oral waiver. *Commonwealth* v. *Philip S.*, 414 Mass. 804, 813 n.7 (1993). The absence of a writing may make proof of the waiver more difficult (as it then rests entirely on the officers' credibility as to what the defendant said and did), but where, as here, the motion judge credits the officers' testimony about the defendant's verbal waiver, the defendant's reluctance to sign the form does not require that finding to be set aside. *Id.*

We do note that there was some inducement offered to the defendant in the form of the highly unusual promise of a walk outside the barracks if he would sign the form.[24] Again, however, we are dealing with the officers' desire to document the waiver, not the obtaining of the waiver itself. Offers of amenities in exchange for a defendant's willingness to waive his rights can render a waiver involuntary. See, e.g., *O'Tinger* v. *State*, 342 So. 2d 1343 (Ala. Crim. App. 1977) (offer to give defendant new pair of boots in exchange for confession rendered confession involuntary); *State* v. *McVay*, 127 Ariz. 18, 20 (1980) (promise to move defendant out of solitary confinement if he confessed would render confession involuntary); *People* v. *Davis*, 29 Cal. 3d 814, 826 (1981) (if police inquiry about defendant's wanting dinner had carried suggestion that dinner would be provided only on making confession, confession would be involuntary); *Commonwealth* v. *Lester*, 392 Pa. Super. 66 (1990) (promise that defendant could have sexual relations with his wife and girl friends while in prison if he gave statement rendered statement involuntary); *State* v. *Furman*, 122 Wash. 2d 440, 451 (1993) (offer of food or water as inducement to confess may render confession involuntary). Here, the officers' expressed willingness to take the defendant out on his requested walk if, and only if, he signed the waiver form, has

---

[23]Such written confirmation of a waiver is "some evidence, [but] it is not dispositive." *Commonwealth* v. *Magee*, 423 Mass. 381, 387 n.8 (1996).

[24]Appellate counsel has not explicitly argued that the promised walk is what made the defendant's waiver involuntary. However, on review under G. L. c. 278, § 33E, we consider all potential appellate issues suggested by the record.

overtones of an impermissible quid pro quo proposal.[25] If such an offer had been made conditioned on the defendant's making a statement, the voluntariness of any later statement would be doubtful. Here, however, the defendant had already (and repeatedly) told the officers that he would speak with them, and he had, on his own initiative, already continued to speak to them for a significant period of time. No improper pressure, promises, rewards, or inducements had been extended to make the defendant talk. Police pressure to make the defendant sign a document evidencing the waiver he had already given verbally does not invalidate the waiver itself.[26]

3. *Instruction on voluntary manslaughter.* At trial, the defendant requested an instruction on voluntary manslaughter. The judge refused to give such an instruction. We find no error.

The defendant argues that Korpela's revelation that she had AIDS and had "probably" transmitted the disease to him constituted adequate provocation for the killing such that the

---

[25]While an offer to take a walk might, in most circumstances, seem like an extremely minor amenity, it would not be trivial to someone in the defendant's predicament. The defendant's observation that "[t]his will probably be my last walk for a long time" illustrates the importance that he attached to being accorded one final walk outside the confines of jail or prison.

[26]The defendant also argues that the failure to make an electronic recording of the interview at the barracks warrants suppression of the confession. He points out that the motion judge did not credit the officers on at least one important issue (the inquiry about an attorney), and contends that the absence of an electronic recording is particularly troublesome when the officers conducting the interview have been determined not to be credible. While we adhere to the view that all parties "would be benefitted in some way by a complete electronic recording" of custodial interrogations and that "a rule requiring such recordings would have much to recommend it," *Commonwealth* v. *Fryar*, 414 Mass. 732, 742 n.8 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997), we have to date declined all invitations to impose such a rule as a matter of either constitutional or common law. See *Commonwealth* v. *Burgess*, 434 Mass. 307, 314 (2001); *Commonwealth* v. *Freeman*, 430 Mass. 111, 115 (1999); *Commonwealth* v. *Pina*, 430 Mass. 66, 70 n.8 (1999); *Commonwealth* v. *Larkin*, 429 Mass. 426, 438 n.10 (1999); *Commonwealth* v. *Fernandes*, 427 Mass. 90, 98 (1998). Bearing in mind that the officers in this case were not found to be entirely credible in their version of what had transpired during the defendant's interrogation, we reiterate that "[p]olice officials should be alert to the merits of recording custodial interrogations and be warned that the time may come when recording in places of detention, at least, will be mandatory if a statement obtained during custodial interrogation is to be admissible." *Commonwealth* v. *Diaz*, 422 Mass. 269, 273 (1996).

jury could have found him guilty of only voluntary manslaughter. In assessing whether a voluntary manslaughter instruction was warranted, we must consider the evidence in the light most favorable to the defendant. *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 745-746 (1975). However, "the judge may not charge on a hypothesis not supported by the evidence." *Id.* at 746.

An instruction on voluntary manslaughter is appropriate "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). "The evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985).

Ordinarily, words alone do not give rise to adequate provocation. *Commonwealth* v. *Bermudez*, 370 Mass. 438, 440 (1976), quoting *Commonwealth* v. *Vanderpool, supra* at 746. "[V]erbal insults and arguments, even if obscene or hostile, cannot constitute sufficient provocation, for a reasonable person 'can be expected to control the feelings aroused' thereby." *Commonwealth* v. *Estremera*, 383 Mass. 382, 392 (1981), quoting *Commonwealth* v. *Bermudez, supra* at 440-441. However, "in certain circumstances, words may convey information constituting adequate provocation to render an unlawful killing voluntary manslaughter." *Commonwealth* v. *Benjamin*, 430 Mass. 673, 680 (2000). "[T]he existence of sufficient provocation is not foreclosed because a defendant learns of a fact from a statement rather than from personal observation. If the information conveyed is of the nature to cause a reasonable person to lose his self-control and did actually cause the defendant to do so,

then a statement is sufficient." Model Jury Instructions on Homicide at 28-29 (1999). "However, this is a very limited exception" that applies only "where the statements constitute a 'peculiarly immediate and intense offense to [one's] sensitivities.'" *Commonwealth* v. *Benjamin, supra,* quoting *Commonwealth* v. *Bermudez, supra* at 441-442. See, e.g., *Commonwealth* v. *Schnopps,* 383 Mass. 178, 180-181 (1981) (wife's sudden admission of ongoing adultery sufficient provocation to warrant instruction on voluntary manslaughter).

The defendant argues that a sexual partner's revelation that she has AIDS and has probably transmitted the virus to the defendant is a "peculiarly immediate and intense offense to [his] sensitivities," *Commonwealth* v. *Bermudez, supra* at 442, such that it amounts to adequate provocation. We need not decide the issue, because the evidence did not, even in the light most favorable to the defendant, satisfy other requirements for voluntary manslaughter. On hearing this news, the defendant, by his own description of events, "cooled off" sufficiently to go downstairs and look for his keys in preparation to leave.[27] When the victim came downstairs, he continued his efforts to leave, proceeding outside to see if his keys were still in the car. The victim also came outside, and was in the process of helping the defendant find his keys when the defendant struck her. Although the defendant's statement described the victim as still "yelling" at this point, the words then being used (to the effect that the defendant was "using her" and that "all men are the same") had nothing to do with sexually transmitted diseases and were well within the category of mere "insults and arguments," *Commonwealth* v. *Estremera, supra,* not information giving rise to a "peculiarly immediate and intense offense to [one's] sensitivities," *Commonwealth* v. *Bermudez, supra* at 442.[28]

Thus, the theory of voluntary manslaughter now presented

---

[27]In a later statement to police the day after his arrest, the defendant told Mawn that he did not believe that the victim had AIDS. The defendant points to the fact that, during a search of his room, the police found literature on HIV and AIDS, suggesting that he was genuinely concerned about having the disease. Whether he was concerned or not, he did not believe that Korpela had AIDS, and he reacted to her claim by leaving the house.

[28]At trial, the defendant relied on a defense that he suffered from an "intermittent explosive disorder" that had caused the attack, not on a theory

was not supported by the evidence, and the judge was not required to instruct the jury on voluntary manslaughter.

4. *General Laws c. 278, § 33E.* We decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial.

*Judgment affirmed.*

---

that the attack was the product of some extreme provocation. Indeed, the defense expert explained that a person with intermittent explosive disorder will react violently to only "slight provocation," provocation that would make normal people only "angry" or make them "want to leave." The expert himself characterized the level of provocation at issue in this case as one that would not lead to violence on the part of an ordinary person but, for someone with intermittent explosive disorder, "that slight type of provocation can lead to this rageful explosion." Consistent with that theory, defense counsel's closing argument explained that, when back in the house, the defendant had not overreacted to the victim's outburst: "[The defendant] reflected and thought [] when he was in the bedroom and [Korpela] was yelling and taunting. And he left. He paused and he reflected. And he was in the downstairs kitchen or living room area, and the same thing occurred. And at that point, he paused and he reflected. And he left." In contrast, when the victim followed the defendant outside "yelling and screaming about [the defendant] using her, saying all men are the same," the defendant had "no time to pause and reflect" and "he snapped." This argument, and the expert testimony on which it was based, is inconsistent with the present claim that the victim's revelation about AIDS (made upstairs while still in the bedroom) was a form of provocation that caused the defendant "to lose his self-control in the heat of passion" and to kill "before sufficient time had elapsed for [his] temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981). Rather, the theory of the defense was that the defendant was "a sick man" who had reacted violently to a "slight provocation" that could readily have been tolerated by an ordinary person.