NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1400

COMMONWEALTH

vs.

JEFFREY ALICEA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant moved to suppress statements he made during a police interview, arguing that he was in custody when he made the statements, yet the police failed to give him Miranda warnings. A District Court judge allowed the motion, and the Commonwealth filed this interlocutory appeal. As we conclude that the defendant was in custody and so should have received Miranda warnings, we affirm.

Background. We summarize the judge's factual findings, which are uncontested, supplemented by our independent review of the video recording of the police interview. See Commonwealth v. Hart, 493 Mass. 130, 135 (2023).

On April 15, 2023, Springfield Police Lieutenant Brian Elliott responded to a dispatch about a domestic violence incident involving the defendant, at the time a Springfield police officer working under Lieutenant Elliott's general supervision.  Lieutenant Elliott spoke to the complaining witness, the defendant's girlfriend Fiona,[1] who said that she and the defendant had an argument while they were in his car.  According to Fiona, when she got out of the car, the defendant picked her up, threw her down, and handcuffed her.  Lieutenant Elliott also spoke to Fiona's father, who said that he saw the defendant "body slam[]" his daughter to the ground.

Lieutenant Elliott returned to the police station, where the defendant was working an administrative role at the window.  Lieutenant Elliott told the defendant he needed to speak to him, stating he was just at the defendant's house and needed to figure out what happened.  Because the defendant was working in a semipublic area, Lieutenant Elliott led him through an office and the booking area to the "OUI room."[2]  Sergeant Jason Sleeper joined them in the room.  All three removed their firearms before entering.

---

[1] A pseudonym.

[2] Lieutenant Elliott testified that the OUI room was where "you would be processed" "if you were to be brought in for operating under the influence."

2

The OUI room is small, approximately eight feet or ten feet squared. The defendant sat in a chair, and Lieutenant Elliott sat directly across from him. Sergeant Sleeper sat to the side. Both Lieutenant Elliott and Sergeant Sleeper were between the defendant and the door, which remained open.

Lieutenant Elliott began the interview by stating that he responded to the defendant's home because of a 911 call about a "domestic occurrence" involving the defendant and Fiona. Lieutenant Elliott then stated twice, "She named you by name." When he said he needed to hear the defendant's side of the story, the defendant asked, "Do you want to hear like how it all started?" Lieutenant Elliott replied, "I'm telling you I was called there today relative to an incident of domestic assault. That's why I'm having you speak to me. So now I'll hear from you."

The defendant proceeded to describe his relationship with Fiona, claiming that they had been fighting for a couple of weeks and that on one occasion she had chased him while holding a knife. After about two minutes, Lieutenant Elliott interjected, "I want to talk to you about today" and "Bring me to what happened today." Instead, the defendant began describing another past incident during which Fiona had allegedly choked him while trying to grab his phone. After

3

about a minute, Lieutenant Elliott again interrupted and asked, "What happened today?"

The defendant then described the events of that day. According to his account, Fiona became upset at something he said and tried to jump out of the car window while the car was moving. The defendant grabbed her shirt and pulled her back in. When she tried to jump out again, the defendant stopped the car, and Fiona got out and walked away. Out of concern for her safety, the defendant followed her and also called her father to come pick her up. Eventually, the defendant tried to put handcuffs on Fiona to calm her down. She reacted by throwing her hands around and pushing back, causing them both to fall to the ground.

At about thirteen minutes into the interview, Lieutenant Elliott stated,

> "So at this point, I'm going to stop you right here. . . . I had a chance to speak to her, and I spoke to her dad. And I have to hear the other half. I mean in domestics you gotta hear both sides. But I've heard enough where I'm going to stop you at this point. Ok? I'm going to Mirandize you."

After administering Miranda warnings, Lieutenant Elliott went on to explain why he was doing so, stating that the defendant had corroborated Fiona's story by admitting that he put his hands on her and tried to put her in handcuffs. The defendant was then placed under arrest.

4

Discussion.  "Miranda warnings are required before police conduct a custodial interrogation."  Commonwealth v. Wardsworth, 482 Mass. 454, 480 (2019).  At the suppression hearing, the Commonwealth conceded that the defendant was subjected to interrogation, but argued, as it does on appeal, that the defendant failed to meet his burden of showing that he was in custody.  The judge disagreed, finding that the defendant was in custody and that Miranda warnings should therefore have been given before the interview.  After "conduct[ing] an independent review of [the judge's] ultimate findings and conclusions of law," Hart, 493 Mass. at 135, quoting Commonwealth v. Tremblay, 480 Mass. 645, 652 (2018), we conclude that the judge correctly resolved the question of custody.

To determine whether a person was in custody, "we ask whether a reasonable person in [that person's] shoes would have perceived the environment as coercive."  Wardsworth, 482 Mass. at 481.  Four factors guide our determination:  (1) "the place of the interrogation"; (2) "whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect"; (3) "the nature of the interrogation"; and (4) whether "the person was free to end the interview" by leaving or asking to leave.  Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).  We agree with the judge that these factors

5

support a finding that the defendant was in custody when Lieutenant Elliott questioned him.

First, a reasonable person in the defendant's shoes would have perceived the place of the interrogation as coercive. Lieutenant Elliott, the defendant's commanding officer, told the defendant that he had been to the defendant's house and needed to speak with him, and then led him through the station to a small room. Although the door was open, Lieutenant Elliott and Sergeant Sleeper, another superior officer, sat between the defendant and the door, effectively blocking his exit. We do not agree with the Commonwealth's assertion that this setting was noncoercive because the defendant was "voluntarily present at the police station." Unlike the defendants in Commonwealth v. Rosa-Roman, 485 Mass. 617, 624 (2020), and Commonwealth v. Amaral, 482 Mass. 496, 501 (2019), on which the Commonwealth relies, the defendant did not go voluntarily to the police station to be interviewed. Rather, he was there on his regular work shift and pulled from his regular duties to be questioned in a small room by two superior officers. These facts are similar to those in Commonwealth v. Gallati, 40 Mass. App. Ct. 111, 112 (1996), where the defendant, a correction officer, was questioned by a superior officer in the office of the deputy superintendent of the correctional facility. Although the

6

correctional facility was the defendant's workplace, we concluded that "a reasonable person in the defendant's circumstances would have perceived the setting isolating and coercive," given that he "was escorted to the place of interrogation by his superior" and "the setting was the office of a superior officer to whom the defendant owed a duty of obedience by training and organizational mandate." Id. at 113. We conclude similarly here.

Second, from the outset of the interview, Lieutenant Elliott conveyed to the defendant that he was a suspect. Lieutenant Elliott began by saying that he responded to the defendant's home for a "domestic occurrence" involving the defendant and his girlfriend. Lieutenant Elliott then said twice, "She named you by name," and reiterated that he was having the defendant speak to him because he was called to the defendant's house "relative to an incident of domestic assault." Objectively viewed, these statements conveyed to the defendant that Lieutenant Elliott suspected him of criminal activity. See Commonwealth v. Earl, 102 Mass. App. Ct. 664, 673-674 (2023); Gallati, 40 Mass. App. Ct. at 113-114.

Third, although Lieutenant Elliott's tone was not overly aggressive, nor was the nature of the interrogation "informal and influenced in its contours by the person being interviewed."

7

Groome, 435 Mass. at 212.  While the defendant was describing past incidents between him and his girlfriend, Lieutenant Elliott interrupted twice and told the defendant to focus on what had occurred that day.  Moreover, while the defendant was giving his account, Lieutenant Elliott interjected numerous questions such as, "Where was this?" and "Why did you phone her father?"  He also asked several follow-up questions about the defendant's use of the handcuffs.  The nature of this questioning supports a finding that the setting was custodial. See Gallati, 40 Mass. App. Ct. at 115 (nature of interrogation supported finding of custody where "[t]here was no idle conversation and the defendant in no way controlled the parameters of the conversation").

Finally, a reasonable person would not have felt free to end the interview by leaving or asking to leave.  The defendant's commanding officer had pulled him from his duties, told him he needed to speak with him, and directed him to a small room to be questioned about his possible involvement in a crime; the commanding officer and another superior officer sat between the defendant and the door; at no point did either of the defendant's superiors tell him he could leave; and the "interview terminated with an arrest."  Groome, 435 Mass. at 212.  We agree with the judge that a reasonable person in these

circumstances would not have felt the freedom to leave.  See Gallati, 40 Mass. App. Ct. at 115 ("Given the nature of the interrogation, its setting, and its focus on the defendant, we conclude that a reasonable person in the defendant's circumstances would not have determined he was free to leave until his superior officer released him").

Considering all of these factors, we conclude that the defendant was in custody and should have received Miranda warnings prior to being questioned.  The judge was thus correct to allow the defendant's motion to suppress his statements.

Order allowing motion to suppress affirmed.

By the Court (Shin, Grant & Smyth, JJ.[3]),

*Paul Little*

Clerk

Entered:  September 23, 2024.

---

[3] The panelists are listed in order of seniority.