NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13340

COMMONWEALTH  vs.  DERRELL FISHER.


Middlesex.     May 5, 2023. - September 20, 2023.

Present:  Budd, C.J., Gaziano, Cypher, Kafker, & Georges, JJ.


Homicide.  Felony-Murder Rule.  Constitutional Law, Admissions and confessions, Voluntariness of statement.  Evidence, Admissions and confessions, Voluntariness of statement, Opinion, Identification.  Jury and Jurors.  Practice, Criminal, Capital case, Motion to suppress, Admissions and confessions, Voluntariness of statement, Jury and jurors, Question by jury, Instructions to jury, Argument by prosecutor.


Indictments found and returned in the Superior Court Department on September 15, 2015.

Pretrial motions to suppress evidence were heard by Kenneth J. Fishman, J., and the cases were tried before Bruce R. Henry, J.


Chauncey Wood (Caroline Alpert & Danya Fullerton also present) for the defendant.
Christa Elliott, Assistant District Attorney, for the Commonwealth.
Caitlin Glass & Joshua M. Daniels, for Boston University Center for Antiracist Research & others, amici curiae, submitted a brief.

     Anton Robinson, Daniel B. Goldman, & Steven Rivera, of New York, & Radha Natarajan, for New England Innocence Project & another, amici curiae, submitted a brief.


     CYPHER, J.  From the night of July 1, 2015, to the early hours of the morning on July 2, Derrell Fisher, the defendant, and Epshod Jeune, his codefendant,[1] engaged in a scheme to rob women they found advertising sexual services on a website (Backpage).  After one successful robbery of a victim at a Woburn hotel, the defendant and Jeune traveled to a second hotel in Burlington (Burlington hotel), where a second victim was shot after she began to scream for help.  The defendant was convicted of murder in the first degree based on a theory of felony-murder, among other charges.

     On appeal, the defendant argues that his motion to suppress was denied erroneously; the judge erred in dismissing two jurors from the venire; a police officer improperly identified the defendant in a video recording at trial, which was exacerbated by the prosecutor's statements and the judge's instructions; the evidence was insufficient for his murder conviction; the judge's instructions to the jury in response to a question regarding third prong malice was incorrect; and the prosecutor's closing argument misstated the evidence.  For these claimed errors, the defendant requests that the court reduce his verdict pursuant to

---

     [1] The two were tried together but have separate appeals.

G. L. c. 278, § 33E, or order a retrial.  We hold that the officer's identification testimony was admitted improperly, but that its admission did not prejudice the defendant.  Concluding that there was no other error, we affirm the defendant's convictions.[2]

1.  Background.  a.  Facts.  i.  The crimes.  Because the defendant disputes the sufficiency of the evidence for his conviction of murder in the first degree, we recite the facts in detail, in the light most favorable to the Commonwealth. Commonwealth v. Oberle, 476 Mass. 539, 540 (2017).

A.  Sanisha Johnson.  On the evening of July 1, 2015, Sanisha Johnson was in her Burlington hotel room.  That night, Johnson had posted a listing on Backpage for sexual services, which included her cell phone number.

Sometime after midnight on July 2, a couple staying in room 116 heard knocking at their door, to which they did not respond. Soon after, from a nearby room they heard a woman call out, "Help me.  Help me," and a loud bang, followed by silence. Other guests also heard cries for help and a loud bang at around

---

[2] We acknowledge the amicus briefs filed by the Boston University Center for Antiracist Research, Massachusetts Association of Criminal Defense Lawyers, Felony Murder Elimination Project, National Council for Incarcerated and Formerly Incarcerated Women and Girls, Kat Albrecht, and The Sentencing Project; and by the New England Innocence Project and The Innocence Project.

half past midnight, two of whom identified the sound as a gunshot.

A hotel employee, Cherin Townsend, heard a loud bang from inside the building on July 2, 2015, between 12:20 and 12:30 A.M., and received a telephone call informing her that somebody heard gunshots. After several telephone calls from guests, Townsend walked to the front desk and called police.

Sergeant Daniel Hanafin of the Burlington police department, the officer in charge on July 2, 2015, at 12:30 A.M., responded to a telephone call from the hotel, along with several other officers. On entering the hotel, officers spoke to individuals gathered in the lobby and to Townsend. After looking through the hallway at issue, officers began calling each occupied room in the corridor and asking occupants to come out into the hallway. After knocking on the doors of rooms whose residents the officers were unable to connect with by telephone, the only room without a response was Johnson's room.

Hanafin and Sergeant Tim McDonough entered Johnson's room to conduct a well-being check. Immediately, they noticed blood droplets on the floor just inside the doorway. Johnson was lying in an odd position on the floor, partially face down and on her side, with blood around her. Hanafin noticed a gunshot wound on her side. Blood smears were located by the telephone on the nightstand and on the bedspread. The telephone cord was

stretched out under Johnson's body.  Officers suspected that Johnson was deceased, which was confirmed by emergency medical responders.

After they found Johnson, Detective James Tigges arrived at the hotel at around 4 or 5 $\underline{A}$.$\underline{M}$. and secured the exit and entrance at the wing of the building closest to the street.  Tigges retrieved a wallet found by a guest at the front desk, which contained a tissue and a receipt from a store in Florida.  Tigges also searched Backpage and located Johnson's advertisement.  When he called the number listed, Johnson's cell phone in the hotel room began to ring.  Upon examining Johnson's cell phone records, officers observed a cell phone number ending in 9575 was used to contact Johnson at around the time of the 911 call (9575 number).

B.  Emily.[3]  From July 1 to July 2, 2015, Emily was staying at a hotel in Woburn (Woburn hotel).  At that time, Emily was working as an escort and advertising for her services on Backpage.  On July 1, before the shooting of Johnson, she was contacted by someone using the 9575 number to ask about her availability that evening; she made an appointment to meet with

---

[3] A pseudonym.

the caller.[4]  She received a text message at 11:52 P.M. from the 9575 number asking for her room number, which she provided.

Emily heard a knock on her door and looked through the peephole in her door to see a young Black man with his hair in shoulder-length braids and wearing a baseball cap.  As soon as she opened the door to let him in, a second man barged into her room along with the first man, pushing Emily into the closet area behind the door and grabbing her face.  The second man also was Black, had medium-toned skin and big brown eyes, and appeared to be very angry.[5]  At the same time that the second man grabbed her, he put a gun to her forehead.  She believed that the gun they used was black and not a revolver, and that both the men were about her height, five feet, four inches tall.  She did not remember seeing tattoos or facial hair on either man.[6]

The second man said to Emily, "If you scream, believe me, I can scream louder.  Where da money at?  I'm not playin'.  Where da money at?"  The first man, who had braids, was standing

---

[4] The 9575 number contacted her at 10:49 P.M. on July 1, 2015, and they had additional telephone calls at 11:21 and 11:53 P.M.

[5] In comparison, she believed that the first man seemed intimidated by the second man and "empathetic" toward her, despite the fact that it was clear that the use of the gun was apparent to the first man who took her property.

[6] The defendant had tattoos on his right arm and a small amount of facial hair.  He is approximately six feet tall.

beside the second man at his left.  Emily told them that she would give them her money, and the second man kept the gun to her side as she went to her dresser.  When she opened a drawer to remove her purse, she remembered that she had hidden her cash under the table between the two beds.  The gun remained pointed at her as she walked toward the table.  The first man was with them between the two beds.

When she went to reach under the table to get the money, the second man with the gun moved her away from the area and forced her to the front of the bed and to the floor; he directed the first man to look for the money while the second man kept the gun on Emily.  The first man grabbed the money, in the sum of $700.

They brought her purse over to the bed and looked through it.  In her wallet, she had medical, identification, and Social Security cards belonging to her and her children, and receipts from her neighborhood stores in Florida.  In her purse she had two money orders.  When the first man found the money orders, he asked the second man whether they should take them, and the second man responded, "No.  Leave those."  As the gun was trained to her head and she was on the floor, the first man, at the direction of the second man, ransacked her room, flipping over the mattresses, looking in the bathroom, and trying to get into the adjoining room through a locked door.  They took

Emily's marijuana from one of her dresser drawers.  One man asked her, "Where da work at?," which she took to be a request for cocaine.  She told them that she did not have any.  As they were leaving, the second man with the gun told her he would "holler at" her.  The men exited to the right, which led her to believe they were going out the back entrance to avoid the lobby.

Although she called the front desk immediately after this incident, when the clerk answered Emily hung up because she needed to continue working.  For that same reason, she did not report the incident to police right away.  Later, while still in Woburn, she heard about Johnson's murder.

When she tried to extend her stay, the manager confronted her with her Backpage advertisement and told her that she had to leave.  She traveled to Maine and had a flight scheduled to return to her Florida home on July 4, 2015.  On the evening of July 3, she called the Burlington police department and reported what had happened to her at the Woburn hotel.

C.  Sarah.[7]  From July 1 through July 2, 2015,  Sarah was staying at a hotel in Saugus (Saugus hotel).  On July 1, Sarah

_____

[7] A pseudonym.  No charges were filed against the defendants in relation to the incident involving Sarah, but evidence of its occurrence was admitted to show the defendants' state of mind, intent, plan, pattern of operation, common scheme, and identity, over the defendants' objection.  The judge instructed the jury that the evidence was not to be considered for propensity or to

had an advertisement on Backpage, to which she received a response. At 10:55 P.M., there was a call from the 9575 number to Sarah's cell phone. There were two more calls placed from the 9575 number to Sarah's cell phone at 11:24 and 11:30 P.M. After she told the caller her room number, she went to the door to admit him. When he knocked on the door and she looked through the peephole, she said, "I'm sorry, but I don't do Black guys." The man at the door responded, "I'm not Black, I'm Spanish." Sarah testified that the man had braids and wore a hat and baggy clothing. She did not let him in because he "just didn't look right to" her.

ii. The investigation. In Johnson's room, police did not find a shell casing. They did find her wallet, which contained $1,875.

On July 2, 2015, State police Trooper Sean O'Brien returned to the Burlington hotel to retrieve its video surveillance. Because the video system was unable to play back the footage at that time, he went to an office building across the street to see whether he could obtain footage from that location. O'Brien discovered that a security camera on the property pointed directly at the street and included the hotel entrance. Aware that witnesses heard a loud noise at around 12:20 to 12:25 A.M.

---

prove that the defendants were of bad character, but only for the limited purpose stated.

on July 2, O'Brien watched the video recording backward from when police arrived at the hotel. He observed that at 12:14 A.M. that day, a light colored, four-door sedan missing a hubcap drove toward the hotel.[8] At 12:23 A.M., this car took a left turn from the hotel parking lot and traveled in front of the office building's security camera, revealing that the front right quarter panel was a different color from the rest of the car.

Later that day, O'Brien was able to view video footage from the Burlington hotel. In the hotel video recording, as viewed from the front and side door cameras, a Black man wearing black cargo-style pants, a sweatshirt with thick horizontal stripes, and a hat with a team logo on the front was seen walking in the front door to the lobby and looking at his "smart phone" at approximately 12:19 A.M. At approximately the same time, a man wearing a black hooded sweatshirt, a hat, and dark pants or jeans walked in the side door and peered in, seemingly waiting and watching for something through the glass, and ultimately entering less than a minute later. At approximately 12:23 A.M., both men were observed running from the side door. The man in the striped sweatshirt had visible thin braids, approximately shoulder length.

---

[8] We have independently reviewed the relevant video footage as part of our review under G. L. c. 278, § 33E.

There were several text messages and calls between Johnson and the 9575 number on July 1, 2015, until 12:19 A.M. on July 2. After speaking with Robert Dingess (a hotel resident) and looking at his cell phone, police learned that Dingess had been friendly with a hotel employee he knew as Remy. Dingess later identified Jeune as Remy. The original telephone number that he had in his contacts for Jeune was the 9575 number.[9]

At approximately 12:30 A.M. on July 2, and continuing through the early hours that morning, the 9575 number contacted Dingess asking what had happened at the hotel, whether someone had been shot, and whether news reporters were present. At 3:07 A.M., someone using the 9575 number sent Dingess a text message to delete that number and the user's messages, that the user would send Dingess a text message from a new number the next day, and that "shit's going to be hot." At 4:55 A.M., Dingess got a text message from a telephone number ending in 8819, which was Jeune's new number.

As a result of this analysis of the records to determine who contacted the 9575 number, officers went to a house on Wildmere Avenue in Burlington at 10:40 A.M. on July 3. O'Brien and Burlington police Detective Thomas Carlson both went to the Wildmere address in separate, unmarked cars and wearing plain

---

[9] Additionally, a friend of Jeune testified that she had used the 9575 number to contact him.

clothes.  Parked in the driveway was a gold-colored four-door Toyota Camry that was missing its left rear hubcap and had a dark front right quarter panel.  The Camry appeared to be "an exact match" to the one that O'Brien had observed in the office building security camera video footage.  They learned from dispatch that the registered owner of the Camry was Jeune.

Carlson and O'Brien set up surveillance down the street from the address with other officers, choosing not to park in front of the house so as to avoid detection.  At some point, the Camry was driven away without drawing the attention of the officers.  After waiting for some time to see whether the Camry returned, police put out a "be on the lookout" for the car.  At approximately 6 P.M., they learned that the car was in Winchester, stopped at a fast-food restaurant drive-through window.

O'Brien took about a minute to arrive; on arrival, he observed three Black men in the car.  Approximately five uniformed police officers from both Winchester and Woburn were in the parking lot when he arrived.  The Woburn officers left when O'Brien and Carlson arrived.  As time went on, additional detectives arrived, including Sergeant Bruce O'Rourke from the State police and McDonough and Tigges.

O'Brien initially had a conversation with the driver of the car, Jeune.  The defendant was the front seat passenger, and

Romane Price was in the right rear seat. O'Brien informed Jeune that they were interested in a car similar to his and told him that he was not under arrest and was free to go. Jeune responded that he knew he was free to go, agreed to step out of the car, and walked to a grassy curbed area in the parking lot to have a discussion with O'Brien. After being asked where he was on July 1 and July 2, Jeune responded that he was at a girlfriend's house in Boston; according to him, the Camry was parked there all night. He would not divulge the girlfriend's name or address. During their conversation, Jeune informed them that he worked at a hotel in Waltham, and that he previously had worked at the Burlington hotel. Jeune stated that he lived at the Wildmere address with his mother and another girlfriend. The conversation lasted from three to four minutes.

O'Rourke approached the car and told the defendant and Price that the car matched the description of a car used in a serious crime that occurred on Wednesday night, and that the occupants of the car might have had nothing to do with that crime but that the officers had a need to investigate the car. The defendant was asked to step out of the car, and he was pat frisked. When O'Brien approached the defendant, he already was out of the car and standing toward the rear of it. Over objection, O'Brien testified that he recognized the defendant to be "the Black male who walked in through the front door of" the

Burlington hotel. The defendant told O'Brien that he lived in Boston and worked at Logan Airport. He said he was working there on July 1 from 11 P.M. until 6:30 A.M. on July 2. Later, this was shown to be false; he worked the night before and the night after, but not July 1 to July 2. The defendant provided O'Brien with his cell phone number, ending in 0046 (0046 number). O'Brien noticed that the defendant's cell phone number appeared on the 9575 number records. O'Brien seized the defendant's cell phone as evidence and, after a conversation of from three to four minutes, told the defendant that he was free to go.[10]

The car was seized as evidence and towed to the Burlington police department. After their brief conversations with the officers, Jeune, the defendant, and Price went into the restaurant to eat. O'Brien was there for a total of approximately forty minutes. A local freelance photographer took photographs of the encounter, which were admitted in evidence at trial.

O'Brien first heard about Emily on the evening of July 3, 2015, after he had the interaction with the codefendants and Price in the parking lot. Emily spoke with Carlson after the stop. That night, police obtained search warrants for the

_____

[10] The defendant's cell phone was not searched until police secured a search warrant.

residences of both the defendant and Jeune. In the early morning hours on July 4, officers executing the search warrant at the defendant's home seized baseball hats, a sweatshirt, and dark colored pants from the defendant's home. O'Brien testified that the hats and the sweatshirt taken from the defendant's home were not those seen in the video recording, and that he could not say that the pants they seized were the pants in the recording with one hundred percent certainty.

At Jeune's address, in a Jeep registered to Jeune that had a flat tire, officers located Social Security cards, health cards, debit cards, Medicaid cards, and identification cards belonging to Emily and her children. They also found a bag with ammunition in it.[11] In Jeune's house, they found a baseball team's hat with stickers on the brim, a box for an Alcatel brand cell phone, various items of clothing, cash, and a keycard that matched the brand of the Burlington hotel.

When officers searched the Camry, they found, among other items, two cell phones (an Alcatel cell phone and a Kyocera brand cell phone) and a hotel employee nametag with the name "Remy." Police also did reenactments of the Camry being driven

---

[11] A State police trooper assigned to the firearms identification section opined that the spent projectile recovered from Johnson's body was .38 caliber. He testified that the ammunition recovered from Jeune's house appeared to be .38 special caliber designed for use in a revolver.

to the Woburn hotel and the Burlington hotel, and the video recordings of the reenactments were entered in evidence.

State police Trooper Edward Keefe examined the Alcatel cell phone (Alcatel), with a telephone number ending in 9096 (9096 number), and found that it had been used on July 2, 2015, numerous times throughout the day to search for articles about the shooting at the Burlington hotel.  Keefe also found that it had been used to view Backpage 199 times, including on July 1.  The Alcatel was used to visit Backpage advertisements for Emily, Sarah, and Johnson on July 1 through July 2.  The Alcatel was used to send several text messages to Bethzaida Hernandez, a worker at the Burlington hotel, the morning after the shooting asking about the incident.[12]  Also on July 2, at around 12:30 P.M., the Alcatel was used to send a text message to a contact named "Mama Bear" stating, "Its on da news now."  The text messages continued, "Delete any n all text or phones kalls from my flip. N this message."  Right after the Alcatel was used to send a text message to Mama Bear, at 12:36 P.M. the user sent a text message to the defendant, "Ima kall u in a min.  Its on da news."  At 12:37 P.M., the Alcatel was used to send another text message to Mama Bear, "I don't wanna be here.  They didn't even

---

[12] Hernandez testified at trial and identified the coworker she knew as "Remy" to be Jeune.  She said that he asked about the murder during their conversation.

search the room yet."  At 1:40 P.M., the Alcatel was used to send a text message to Mama Bear asking, "Did u Google it?"  At 1:42 P.M., Mama Bear sent a text message to the Alcatel, "I'm bout to now."  At 2:28 P.M., Mama Bear sent another text message:  "No suspects."[13]

Someone using the Alcaltel contacted the defendant's cell phone number (listed in the Alcatel's contacts list as "Staxx") ninety-eight times.  The defendant's cell phone was used to contact the Alcatel (listed in the defendant's contacts list as "Eps") at 10:44 and 11:48 A.M. on July 2, and someone using the Alcatel called the defendant at 10:59 A.M. that same day.  At 12:44 P.M., after the Alcatel was used to send the text message that the user would call regarding what was on the news, the Alcatel was used to call the defendant.  The defendant called the Alcatel at 1:08 and 1:09 P.M.  The last contact between the Alcatel and the defendant's cell phone was on July 3 at approximately 1:14 P.M.

The defendant's cell phone also received an incoming call on July 3 at 2:19 P.M. and was used to make an outgoing call to the telephone number ending in 8819 at 2:22 P.M.  This was the third telephone number connected to Jeune; Dingess received a

---

[13] There were further text messages between Mama Bear and the Alcatel regarding the news throughout the day.

text message from this number stating that it was the new cell phone number for "Remy."

On July 1, 2015, the defendant and the 9575 number had contact at 12:08 and 8:48 P.M.  On June 12, the defendant was asked by another individual what was "Eps"'s cell phone number: the defendant's cell phone was used to send a text message with the 9575 number in response to the inquiry.  On July 3, after the shooting of Johnson, when the same individual asked the defendant for the cell phone number again, the defendant gave the 9096 number.

There was no outgoing activity on the defendant's cell phone on July 1, 2015, from 11:56 P.M. to July 2 at 12:09 A.M. Again from 12:09 through 12:35 A.M., there was no outgoing activity.  State police mapped the available cell site location information (CSLI) for the defendant's cell phone.  The CSLI on July 1 at 8:54 P.M. put the cell phone and its user at 1010 Massachusetts Avenue in Boston.  On July 2, just past 1 A.M., CSLI placed the cell phone near Hyde Park Avenue in the Roslindale section of Boston.  At 1:08 A.M., it placed the cell phone on Brookway Road in Roslindale.  At 1:09 A.M., CSLI put the cell phone on Hyde Park Avenue, by the Forest Hills transit station.  At 1:26 A.M., CSLI showed the cell phone to be near the intersection of Morton Street and Blue Hill Avenue in the Mattapan section of Boston.  The window of time in between 8:54

P.M. on July 1 and 1 A.M. on July 2 was not produced by the defendant's cell phone provider.

The CSLI for the Alcatel put the cell phone in Saugus at 11:30 P.M. on July 1, the time at which the Camry was seen at the Saugus hotel. The CSLI jumped ahead to 3:13 A.M. on July 2, when the Alcatel used a tower on Massachusetts Avenue in Boston. Also at 3:13 A.M., it used a tower on Blue Hill Avenue in Boston to receive a text message. Between 3:30 and 3:45 A.M., the CSLI placed the Alcatel near Neponset Avenue in the Dorchester section of Boston. At 5:07, 7:27, 8:46, 9:19, and 9:21 A.M., the Alcatel used a tower located on Mountain Road in Burlington.

According to CSLI, the cell phone associated with the 9575 number was in the area of 500 Morton Street in Dorchester at 9:40 P.M. on July 1. At 9:44 P.M., the 9575 number activated a tower on Cummins Highway in Roslindale. The 9575 number also activated towers in Saugus, Woburn, and Burlington at the times it was being used to communicate with the cell phones of Sarah, Emily, and Johnson. On July 2, from 12:30 to 12:38 A.M., it activated towers in Woburn, Stoneham, and the Charlestown section of Boston. At 12:42 A.M., its CSLI disclosed its location in the area of Traveler Street in Boston. In going through the 9575 number records, the last call made from the 9575 number was at 1:35 A.M. on July 2, 2015.

After the search of the defendant's home, on July 4, O'Brien watched video footage from the Woburn hotel from July 1 to July 2, 2015.[14]  On July 1, 2015, at approximately 11:52 P.M., the video recording showed a car being driven around the parking lot.  The car was a light-colored four-door sedan missing its left rear hubcap and with a different color gasoline cap cover (which he noticed on the Camry during the stop), appearing also to be a match to the car in the office building security camera video recording.  The car was driven around the hotel several times before it stopped, and a Black man got out of the car and walked into the hotel at approximately 11:54 P.M.  The man walking into the hotel was wearing a hat with a baseball cap with an "A's" logo on the front, a black sweatshirt, a white shirt with a design on the front, and dark pants.  The man walked over to a side door and appeared to manipulate it before walking out the front door while using a cell phone.  The car then was driven to the side door; two men got out of the car -- the same man who previously had manipulated the side door, along with a second man who walked to the side door and went into the

---

[14] Also on July 4, Carlson and two other police officers picked up Emily in Maine.  When Emily was shown a photographic array that included Jeune (and not the defendant), she suggested that someone who was not Jeune may have been involved.  She identified the wallet and the receipt found by police as having been stolen from her.

hotel at approximately 11:58 P.M.[15]  The second man was wearing a striped sweatshirt, black pants, and a hat, and had his hair in braids.  The car was parked, and the two men came out of the side door at approximately 12:05 P.M. after coming from the side stairwell area.  As the car was driven away, the different color front quarter panel was visible.  Both men appear to be the same men who appeared in the Burlington hotel video recording.

O'Brien also observed video footage from the Saugus hotel where Sarah stayed on July 1 and July 2.  On this video footage, he observed the same Camry.  O'Brien observed that the same men who appeared in the Burlington hotel and Woburn hotel footage were in the Saugus hotel video recording.  O'Brien identified the man wearing the striped sweatshirt as the defendant.  At approximately 11:32 P.M. on July 1, the man wearing the striped sweatshirt walked in the front door of the hotel and to a side door, where he let the second man in, and both men ascended the stairs.  A little more than five minutes later, the two men came out the side door with their hoods up, and the Camry was driven away.

The defendant's girlfriend at the time of the crimes testified that she knew Jeune as a friend of the defendant, and that Jeune drove a brown or tan car.  She braided the

---

[15] The car then was driven off, suggesting a third individual was involved.

defendant's hair at that time, and he had a "bunch" of single, chin length "unattached braids." She had seen the defendant with a gun on one occasion in early to mid-May 2015.

b. Procedural history. On July 5, 2015, the defendant agreed to accompany officers to the Woburn police station, where he was arrested. The defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1; attempted armed robbery, G. L. c. 274, § 6; unlawful possession of a firearm, G. L. c. 269, § 10 (a); armed robbery, G. L. c. 265, § 17; home invasion, G. L. c. 265, § 18C; and armed assault in a dwelling, G. L. c. 265, § 18A.

On July 18, 2016, the defendant filed motions to suppress statements of the defendant, evidence recovered during the stop of the Camry and from the defendant's home, and Emily's identifications of the defendants as she saw them in a news article online. The motion to suppress Emily's identifications was allowed, but the other motions to suppress were denied.

A jury trial was held in November 2017. The defendant was found guilty of murder in the first degree on a theory of felony-murder and of attempted armed robbery of Johnson, guilty of the lesser included offense of unarmed robbery of Emily, and not guilty of unlawful possession of a firearm, home invasion, and armed assault in a dwelling. The defendant was sentenced to a mandatory term of life in prison for the murder conviction and

a concurrent term of from five to ten years in prison for the unarmed robbery conviction.

2. Discussion. a. Motion to suppress statements. The defendant argues that he was in custody when police asked him questions about his whereabouts at around the time of the crimes; therefore, he should have been given his Miranda warnings. The Commonwealth argues that the defendant was not in custody when he was questioned.

We discuss the facts as found by the motion judge, supplemented only by uncontroverted evidence from witnesses credited by the motion judge. Commonwealth v. Privette, 491 Mass. 501, 518 (2023). The motion judge found that, at 5:58 P.M. on the day of the stop, Officer Edward Chisholm of the Woburn police department parked his cruiser at an angle to prevent the Camry from exiting the drive-through and approached the passenger's side with his gun in his holster.[16] After observing Chisholm approach, Woburn police Detective John Walsh approached the car with his gun drawn in the "low ready" position. There was no evidence that the defendant, Jeune, or

---

[16] The defendant does not challenge any factual findings by the motion judge, except that police never conveyed to the defendant that he was a suspect.

Price saw Chisholm with his weapon out of his holster.[17] Chisholm "calmly" told the occupants of the car that he needed their identifications, and that the car may have been involved in a crime; the defendant, Jeune, and Price were cooperative.

O'Brien and Carlson arrived at the fast-food restaurant soon after 6 P.M. There were as many as thirteen officers from different agencies at various times, but a large portion of these officers left the scene or were standing near the perimeter of the parking lot.[18] Walsh and Chisholm left the scene minutes after O'Brien and Carlson arrived.[19]

O'Brien asked Jeune to get out of the car and told him that he (O'Brien) wanted to speak with him regarding a similar car and an investigation in Burlington. They spoke as Jeune sat on a curb in an area away from the car. O'Rourke was present for this conversation, and O'Brien told Jeune he was not under arrest and was free to leave, which Jeune acknowledged by stating, "I know." He was not provided with Miranda warnings,

_____

[17] Price, who testified at the hearing on the motion to suppress, said that the officer approaching the car had his hand on his gun, but did not have his gun out.

[18] Winchester police stood by on the main street as a uniformed presence as the stop was conducted in their jurisdiction, but they were not near the car.

[19] A photograph taken by a freelance photographer depicted a police car leaving the scene while an officer, presumably Carlson, stood next to the defendant at the passenger's side door.

but ultimately ended the conversation when he was asked whether officers could search the car, and he responded in the negative, telling the officers, "I think I need a lawyer." Jeune was then told that they would be seizing the car, but that he was free to leave.

Carlson, O'Rourke, and O'Brien all noticed that the defendant looked similar to the Black male with braids depicted in the Burlington hotel surveillance video recording. O'Rourke told the defendant and Price that police were interested in the car as it potentially had been involved in a serious crime where weapons were used, and the defendant was asked to step out of the car. O'Rourke asked the defendant whether he had any weapons on him, and the defendant said that he did not. O'Rourke conducted a patfrisk of the defendant at the rear of the car; Carlson had his hand on the defendant, and a few other officers were off to the left out of arm's reach of the defendant. The defendant was told that he was not under arrest, and he was not provided with Miranda warnings. O'Rourke testified at the hearing on the motion to suppress that the defendant was not free to leave until the patfrisk was complete, and O'Rourke did not tell the defendant that he was free to leave after he concluded the patfrisk.

When Carlson and O'Brien spoke to the defendant in a grassy area to the right of the pavement near the entrance, however,

they advised him that he was free to leave.  The defendant responded, "O.K.," and proceeded to answer the officers' questions about his whereabouts on the day of the crime, his home address, and his telephone number.  His cell phone was seized, and the car was towed.  The defendant, Jeune, and Price went into the restaurant and were allowed to leave.  The motion judge found that the fact that the defendant and Jeune had become suspects was not conveyed to them during the stop.[20]

Price, the defendant's cousin, testified that he twice asked officers whether he could leave, and that he was told in response that he could leave when the officers were finished. The motion judge found it "noteworthy" that in none of the photographs taken of the encounter were officers seen standing in the area where Price stood behind the car.[21]

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'"  Commonwealth v. Medina, 485 Mass. 296,

---

[20] Connolly, who also was present to speak with the defendant, testified:  "In my eight years in the police, I do[ not] think that I[ have] ever seen a more casual environment for considerably such a serious incident."

[21] The motion judge rejected Price's testimony that he was subjected to a patfrisk.

299-300 (2020), quoting Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018).

When a suspect is subjected to custodial interrogation, Miranda warnings are required.[22] Medina, 485 Mass. at 300. "A person is in custody whenever he is 'deprived of his freedom of action in any significant way.'" Commonwealth v. DePeiza, 449 Mass. 367, 375 (2007), quoting Commonwealth v. Almonte, 444 Mass. 511, 517, cert. denied, 546 U.S. 1040 (2005). Two related inquiries inform the determination as to whether a suspect was "in custody" at the time of questioning: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Medina, supra, quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995).

"Even where a suspect is temporarily seized, '[n]ot every Terry-type investigative stop results in a custodial interrogation.'" Cawthron, 479 Mass. at 617, quoting DePeiza, 449 Mass. at 375. See Terry v. Ohio, 392 U.S. 1 (1968); Commonwealth v. Kirwan, 448 Mass. 304, 312 (2007) (defendant not in custody, "although the defendant was not free to leave, [the]

---

[22] We agree with the motion judge that asking the defendant where he was on the night of the crimes was "designed to elicit incriminatory responses from the defendant," and thus constituted interrogation for purposes of Miranda.

interrogation was brief and in the nature of a preliminary investigation, and the defendant's detention was minimal and similar to a Terry-type stop").

We recognize that "[t]he custody and seizure inquiries . . . are not identical." Commonwealth v. Evelyn, 485 Mass. 691, 698 (2020). The custody inquiry, for Miranda purposes, "primarily protects the right against self-incrimination and the right to counsel under the Fifth and Sixth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights." Id. Conversely, the seizure inquiry is concerned with "the right to be free from unreasonable seizures under the Fourth Amendment and art. 14." Id. The inquiries each "consider somewhat different questions." Id. Under both inquiries, however, the totality of the circumstances are considered, "limited to the objective circumstances of the encounter," to determine whether a person has been compelled to engage with the police. Id. at 698-699. Here, the defendant argues specifically that he was in custody at the time of the encounter, rendering his statements unlawfully obtained.

A court considers, at a minimum, four factors when determining whether the circumstances surrounding an encounter suggest that a defendant is in custody during an interrogation:

"(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the

> nature of the interrogation, including whether the
> interview was aggressive or, instead, informal and
> influenced in its contours by the person being interviewed;
> and (4) whether, at the time the incriminating statement
> was made, the person was free to end the interview by
> leaving the locus of the interrogation or by asking the
> interrogator to leave, as evidenced by whether the
> interview terminated with an arrest."

Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001). "Rarely is any single factor conclusive." Cawthron, 479 Mass. at 618, quoting Commonwealth v. Bryant, 390 Mass. 729, 737 (1984). The Groome factors are not intended to be "a straitjacket," and "they do not limit the obligation of a court to consider all of the circumstances that shed light on the custody analysis." Medina, 485 Mass. at 301. Applying these factors in the circumstances here, the defendant has not met his burden to show that he was in custody when he made the incriminating statements to the officers. See Cawthron, supra.

The interrogation took place at around 6 P.M. in a drive-through and parking lot area of a fast-food restaurant. This environment, in itself, was not coercive. See Cawthron, 479 Mass. at 618 ("The detectives questioned the defendant in a public parking lot, during the day, and the defendants were neither handcuffed nor otherwise physically restrained. This environment was not police-dominated"). The car was blocked from exiting the drive-through by a cruiser on its initial stop, and officers had firearms visible, although there was no

evidence that they were seen to be drawn. The defendant was not handcuffed, nor was Jeune. Although the judge found that there were as many thirteen officers at the stop at various times, many officers left quickly after they arrived, or did not interact with the suspects. See Medina, 485 Mass. at 302 (and cases cited) ("Although more officers arrived over the following two hours, it does not appear that they meaningfully restricted the defendant's freedom of movement within his home"). See also Commonwealth v. Alcala, 54 Mass. App. Ct. 49, 54 (2002) ("Although some ten to fifteen local, State, and Federal police and other officers were in the general vicinity, and perhaps six or seven 'converge[d]' on the three men at the building, no more than two officers were with the defendant when he was interrogated").

That the defendant was moved a short distance to be questioned separately does not alter the conclusion. "[T]he act of separating defendants briefly for individual questioning does not create an inherently coercive environment." Cawthron, 479 Mass. at 619. Contrast Commonwealth v. Coleman, 49 Mass. App. Ct. 150, 154 (2000), quoting Commonwealth v. Gallati, 40 Mass. App. Ct. 111, 113 (1996) (situation "isolating and coercive" where three police officers were deployed in small room with path to closed door "shadowed by the questioner himself"). Where the questioning was very brief, the separation of the

defendant to the grassy area of the parking lot alone did not render the environment a coercive one.

Whether the defendant was questioned in a police-dominated area, given the circumstances mentioned supra, is a close call. We assume that he was questioned in such an area for the sake of our analysis and move on to discuss the other three Groome factors.

We agree with the motion judge that the officers did not convey to the defendant that he was a suspect in the murder investigation. Even before being questioned by O'Brien, O'Rourke told the defendant and Price that the crime "might have nothing to do with you but, if you don't mind, just keep your hands on your lap." The fact that O'Rourke asked the defendant to step out of the car and pat frisked him did not on its own communicate to the defendant that he was a suspect. In fact, O'Rourke testified that he told the defendant, after asking whether he had any weapons on him, "I[ am] going to pat you down and make sure. Is that okay with you?"[23] He testified that the

_____

[23] The fact that O'Rourke subjectively knew that the defendant was not free to leave until he was frisked is not of importance because that was not expressly communicated to the defendant. See Medina, 485 Mass. at 303, quoting Commonwealth v. Morse, 427 Mass. 117, 123-124 (1998) ("[S]ubjective beliefs held by law enforcement officers are irrelevant in the determination whether a person being questioned is in custody for purposes of the receipt of Miranda warnings, except to the extent that those beliefs influence the objective conditions surrounding an interrogation").

defendant responded in the affirmative.  The officers' suspicions "remained unexpressed at this point," and there was no evidence that they indicated to the defendant his similarity to the individual in the video footage.  Medina, 485 Mass. at 302-303 (police did not signal to defendant he was suspected of committing crime even where they explained they received report that human remains were in defendant's home).  See DePeiza, 449 Mass. at 376 (officer "did not imply that the defendant was suspected of a crime merely by asking if he was carrying a gun.  Carrying a firearm is not a crime, and the defendant does not suggest any other criminal conduct of which he was suspected. . . .  Miranda warnings were not required between the announcement of the patfrisk and the frisk itself").

Even accepting the motion judge's finding that the defendant was "clearly not free to go at" the time of the pat frisk, when he spoke with O'Brien afterward, O'Brien explicitly told the defendant that he was not under arrest and that he was free to go.  These circumstances would not transform the encounter into a custodial one.  See Groome, 435 Mass. at 213 (defendant's fear he might be in custody when in police cruiser voluntarily was addressed by officer "when he told the defendant that he was not being arrested").  See also Cawthron, 479 Mass. at 619 (asking defendant what he had just purchased, when detective believed he witnessed drug transaction, did not convey

suggestion defendants were suspects because it could have referred to innocent activities).

Moreover, the nature of the interrogation points to a conclusion that the defendant was not in custody when he was questioned. The motion judge found that the "questioning was not aggressive in any respect." This conclusion was supported by the evidence presented at the hearing on the motion to suppress. The defendant was questioned by two law enforcement officers: O'Brien and Connolly. "[N]othing in the record suggests that they were 'aggressive,' 'persistent,' or 'harsh,' which would support a conclusion that the defendants had been subject to a custodial interrogation." Cawthron, 479 Mass. at 621, quoting Coleman, 49 Mass. App. Ct. at 155. In fact, Price admitted on cross-examination at the hearing on the motion to suppress that the officers were polite and courteous. The questions asked by the officers were "investigatory rather than accusatory" where there was no indication that they "raised their voices, threatened the defendant, or expressed disbelief in response to his answers." Medina, 485 Mass. at 303, quoting Kirwan, 448 Mass. at 311.

Finally, the brief questioning terminated with the defendant, Jeune, and Price walking around the area and congregating among themselves without police supervision. They went into the fast-food restaurant after the encounter and left

the location without being arrested by the officers.  Although freedom to leave "may be a critical factor . . . [but] cannot be the determinative factor," the fact that the defendant was free to leave, acknowledged that he was aware of that, and did leave strongly supports a conclusion that a reasonable person in the defendant's position would have felt free to leave.  Medina, 485 Mass. at 304, quoting Cawthron, 479 Mass. at 623.

We conclude, based on the totality of the circumstances, that the defendant was not in custody at the time he was questioned by the officers because a reasonable person in his position would have felt that he was free to leave during the questioning.[24]

The defendant also asks that the court consider race as a factor in considering whether a person such as he would feel free to leave a police interaction.  We have held that "the more pertinent question is whether an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay."  Commonwealth v. Matta, 483 Mass. 357, 362 (2019).  We acknowledge "that the troubling past and present of policing and race are likely to inform how African-Americans and members of

---

[24] The fact that O'Brien characterized the motor vehicle stop as a "takedown" in his notes does not transform a noncustodial encounter into a custodial one.

other racial minorities interpret police encounters." Evelyn, 485 Mass. at 701. As we determined in Evelyn that other factors led to a conclusion that the defendant was seized, we did not decide "whether the race of a defendant properly informs the seizure inquiry." Id. at 703. Similarly, here, where the totality of the circumstances discussed supra overwhelmingly suggest that the defendant was not in custody for purposes of Miranda v. Arizona, 384 U.S. 436 (1966), consideration of his race would not tip the scale with respect to whether the defendant was in custody in this particular case. "We do not decide constitutional questions unless they must necessarily be reached." Commonwealth v. Raposo, 453 Mass. 739, 743 (2009), quoting Commonwealth v. Paasche, 391 Mass. 18, 21 (1984). Thus, we do not answer the question posed here. Evelyn, supra ("We . . . attempt to focus attention on the issue of race, while not establishing bright-line rules that potentially could do more harm than good").

b. Dismissal of jurors. The defendant argues that the judge's dismissal of two jurors for their ability to understand the "legal principles" and "complex issues" in the case was structural (and prejudicial) error, and the product of racial bias. The Commonwealth argues that the judge properly excused the jurors because they were unable to sufficiently understand the judge's instructions on the legal issues. The Commonwealth

also argues that there is no evidence of racial bias on behalf of the judge. We agree with the Commonwealth that the judge did not abuse his discretion in excusing the jurors.

Juror no. 14 was a twenty-two year old woman who grew up in Haiti and, when she was in the eighth grade, moved to the United States with her adoptive parents, finishing high school in Middleton. During voir dire, counsel for the defendant asked her about her "feelings or understanding [of] the presumption of innocence." She responded, "My feeling is, I don't know, it's sad, I would say. I don't know. Yeah, but. That's all I have, that's it really sad, but." After counsel asked her, "What's sad?", she responded, "From the basic of the beginning of the paper, and like when I read it over again, it's sad to, like, read it and listen to it. But, yeah." When counsel pressed juror no. 14 again on her understanding of the presumption of innocence, juror no. 14 answered, "I do not exactly know what it means, so I don't think I really have a position here. It's sad."

Counsel then asked her whether she knew what it meant to be innocent. She replied,

> "Innocent is just, like, if the person, if there's two people and then one of the commits something and the other one was there but did not really do anything, so I would think he or she was innocent. . . . But I don't know if he or she is still going to be affected by just being there. But I would call that person innocent."

When asked what presumption meant, juror no. 14 stated that she did not know.  When the judge asked her whether she understood the legal information about the case when he read it to the jurors, juror no. 14 responded that she did understand.  The Commonwealth asked her whether she would be able to look at each defendant individually and determine on the evidence whether the case was proved against them beyond a reasonable doubt.  Juror no. 14 responded, "Um, I do not know.  No?"  The Commonwealth then broke it down for the juror; she understood the defendants were charged in a joint venture, and that she had to decide their guilt or innocence individually based on the evidence.  When asked about joint venture, juror no. 14 said, "The words, joint venture, that someone, like, I don't know, I don't exactly understand that part.  But I think that's the only part that maybe, like, bring me down in the question a little."  After the Commonwealth read the judge's instructions on joint venture to the juror again, she said that she thought she would be able to follow them.  Jeune's attorney then asked leading follow-up questions of the juror.  Juror no. 14 indicated that she would follow the law the way the judge gave it to her.

After asking juror no. 14 to step outside, the judge spoke with counsel:

"I have a concern about her understanding of the legal principles, but I'm going to listen.

"Her initial response when asked about those aspects did not demonstrate that she really did have an understanding. I think everybody was trying to get her to that point, but I have a concern about her level of understanding.

"So, I'm willing to listen."

Counsel for the defendant stated that her willingness to learn and her interest suggested that with "more time and experience," she would be fully capable of understanding the requisite law. Jeune's attorney discussed juror no. 14's race and said, "of all the people that have come here this morning, this is the person that is closest demographically to my client." He noted his concerns about striking jurors "because their vocabulary is not the same as our educated vocabulary." The Commonwealth stated that juror no. 14 was "a remarkable young woman" who had "overcome tremendous obstacles and is obviously very bright and very engaged." Nonetheless, the Commonwealth was unsure that juror no. 14 understood the presumption of innocence. Defense counsel admitted that he "was a little perplexed [himself] when she said that she was sad by it," but he thought her confusion was due to a vocabulary issue.

The judge told counsel:

"It is important to me to make sure that we have a fair and impartial jury. It is important to me that, if we can, . . . we have some representation on the jury of people that have backgrounds and who look like the defendants. I think that's important.

"But it is important to me that we have jurors who can understand and who demonstrate an ability to do this. This

is an extremely serious matter, and I have a concern about her ability to understand.

"And we may not know whether she understands a concept. The concepts that she was asked about, she did not demonstrate a real understanding of.

"So while I'm torn, I'm going to excuse her."

At the request of Jeune's attorney, the judge allowed a few more questions in voir dire. Juror no. 14 indicated that she did her own research into the word "assumption" or "presumption," and said that it meant, "you think or something but it's not certainly true. Like, you think of something but you're not exact of whether or not it is true." When he asked her whether she believed that the defendants were innocent unless the government could prove them guilty, she said, "I don't want to say the wrong thing." After he told her, "legally, these guys are innocent unless the government can prove that they're guilty," she said, "Yes."

The defendant's counsel asked juror no. 14 whether she looked up "assumption" rather than "presumption," and she said she looked up both. Jeune's attorney asked her whether she would like to serve on the jury, and she said, "Um, no. I don't know." The judge asked her whether she had a concern about her ability to disclose her real answer to the questions, and after some back and forth, juror no. 14 indicated that she was concerned about whether "to say the right thing or not. I do

not want to go down the wrong way with where to answer the right question or not." She stated that she was concerned about making the wrong decision in a case such as this. When Jeune's counsel asked her whether she could figure out the trial, she said, "If I get -- I don't know. If I learn more about it, I will say yes." Over the defendant's objection, the judge excused the juror. Jeune's attorney withdrew his objection.

Later that day, juror no. 65, another Haitian-American woman, indicated on the juror questionnaire that she had a scheduling problem. When asked about her problem, she said, "Scheduling. Language." The judge asked her, as a follow-up, whether she had a good reason why she could not serve as a juror, and she answered in the negative. Juror no. 65 indicated that English was not her first language, and that she had "just [a] little bit" of difficulty understanding the questions. The judge asked her whether she had "some difficulty understanding the discussion that we had about some of the law that applies here?" She replied, "Little bit." The judge asked her whether her difficulty with the language would make it difficult for her to be a juror. She first replied, "I don't know," then she replied, "No." Juror no. 65, on her own, offered, "I'm gonna try," but then acknowledged that the language would make it difficult for her.

When the judge asked about her acknowledgment on the questionnaire that there is something that would make it difficult for her to participate in the trial, juror no. 65 said, "Because I'm gonna ask you to repeat for me if I not understand very well this question."  When the judge explained the question further, juror no. 65 said, "Well, I misunderstood.  I don't have any problems.  Sorry."  Although she checked off on the questionnaire that she knew someone from the district attorney's office for Middlesex County or the defense attorneys' offices, she told the judge, "No, I don't know anyone."  Over objections from both Jeune and defense counsel, the judge excused juror no. 65.  Jeune's attorney opined that juror no. 65 was not given a fair opportunity.  The judge explained that he excused her because she mistakenly answered "yes" to all the questions stated above.  The judge stated:  "[In] those circumstances, I feel that she was not a person who would have understood the complex issues in this particular case."

We review the judge's dismissal of the jurors for an abuse of discretion.  Commonwealth v. Grier, 490 Mass. 455, 467 (2022).  We will only find an abuse of discretion "where 'the judge made a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'"  Id. at 467-468, quoting Commonwealth v. Grassie, 476 Mass. 202, 214 (2017),

S.C., 482 Mass. 1017 (2019). "We afford a trial judge a large degree of discretion in the jury selection process." Commonwealth v. Perez, 460 Mass. 683, 688 (2011), quoting Commonwealth v. Vann Long, 419 Mass. 798, 803 (1995).

It is a trial judge's duty to ensure that a "prospective juror will be able to fairly evaluate the evidence and apply the judge's instructions on the law." Commonwealth v. Williams, 481 Mass. 443, 453 (2019). Voir dire of jurors, in a criminal case, "shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the [C]ommonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence on the defendant's behalf." G. L. c. 234A, § 67A. "If the court finds that such juror does not so understand, another juror shall be called in." Id.

The judge's questions and the attorneys' inquiry of both jurors were designed to ensure understanding of these crucial concepts. As to juror no. 14, despite her clear misunderstanding of the quintessential legal principle of "presumption of innocence," the judge allowed the attorneys to question her extensively, presumably with the hope that she would gain an understanding. The judge explicitly indicated that he was sensitive to her similarity in race to the

defendants, but his concern that she could not understand the important legal concepts at play resulted in her exclusion.

Although the attorneys were not permitted to examine juror no. 65 as they were juror no. 14, it was clear based on the voir dire that juror no. 65 had comprehension problems that likely would affect her ability to serve as a juror in this complicated trial.  Juror no. 65 herself acknowledged that the language barrier would make it difficult for her to serve on the jury. When a "person is not able to speak and understand the English language," there are grounds for disqualification from jury service.  G. L. c. 234A, § 4.

It is true that, in certain circumstances, "[a] 'lack of working knowledge of the vocabulary of criminal law . . . simply does not qualify as a valid, race-neutral basis on which to exercise a peremptory challenge." Commonwealth v. Rosa-Roman, 485 Mass. 617, 637 (2020), quoting Commonwealth v. Benoit, 452 Mass. 212, 224 (2008) (improper to exercise peremptory challenge in response to juror's confusion about word "interest" in context of having "stake in the case").  See Benoit, supra ("juror's slip of the tongue" in her use of term "prosecute" rather than "convict" did not qualify as race-neutral basis to exercise peremptory challenge).  Nonetheless, lack of comprehension is a "legitimate reason[] to doubt [a] juror's suitability to serve."  Grier, 490 Mass. at 468.

In Grier, 490 Mass. at 467, a juror who had been seated was discovered, following a criminal record check, to have failed to disclose several prior arrests and charges when filling out the questionnaire. After an additional voir dire with the juror on the next day of jury selection, the judge excused him for cause, citing "concerns about comprehension and about candor." Id. Defense counsel objected, as this was the only Black male on the jury. Id. We held that it was a fair inference that the failures to disclose could be explained by either a lack of candor or comprehension, which supported the judge's decision to excuse him. Id. at 468. This conclusion was bolstered by the juror's nonresponsive answers to the judge's questions during the additional voir dire. Id.

Similarly, here, both juror nos. 14 and 65 gave answers that illustrated their lack of comprehension, despite both of their seemingly genuine efforts to understand. This did not appear to be connected to any heightened standard imposed by the judge as to a juror's intelligence, education, or robust knowledge of legal vocabulary, but rather appeared to be connected to the jurors' minimal understanding of the defendant's right to be presumed innocent and their ability to follow instructions as given to them by the judge. Contrast Commonwealth v. Robertson, 480 Mass. 383, 396 n.11 (2018) (Commonwealth's reason for challenge that "juror did not seem

intelligent" was "insufficient in these circumstances" to overcome other considerations in first step of Batson-Soares analysis). In such circumstances, we cannot say that the judge abused his discretion in dismissing them.

Nor can we conclude that the judge's dismissal of the jurors was a product of implicit bias, where he had legitimate, comprehension-based reasons to excuse them.[25] To the contrary, at least as to juror no. 14, the judge explicitly acknowledged her race in making the difficult determination to excuse her. The judge did not improperly "scrub[] [the jury] . . . of a group of jurors, representative of a substantial segment of society, who might have been particularly sensitive to the racial dynamics at play in the case," and did not treat juror nos. 14 and 65 differently from non-Black jurors, as alleged by the defendant. Commonwealth v. Alves, 96 Mass. App. Ct. 540, 548 (2019). The judge excused several non-Black jurors, including Hispanic and white individuals, who expressed a failure to comprehend core foundational principles or difficulty

---

[25] See Commonwealth v. Sanchez, 485 Mass. 491, 516 n.1 (2020) (Lowy, J., concurring), quoting Commonwealth v. Buckley, 478 Mass. 861, 878 n.4 (2018) ("Multiple studies confirm the existence of implicit bias, and that implicit bias predicts real-world behavior. . . . That is, even people who do not believe themselves to harbor implicit bias may in fact act in ways that disfavor people of color").

with English during voir dire.[26]  And just as the judge gave juror nos. 6 and 39, for example, an opportunity to explain and clarify their answers (partly, as it related to juror no. 6, in response to defense counsel's confusingly worded questions), he also gave juror no. 14 numerous opportunities to clarify her answers, as discussed in detail supra.  As to juror no. 65, the transcript and her answers in the questionnaire convey that she had a problem understanding the judge's basic questions, without even getting into the legal principles in the case.  See Williams, 481 Mass. at 457 ("It is the exclusion of prospective jurors 'solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community' that violates a defendant's constitutional right to a fair and impartial jury, not excusing prospective jurors for cause because the judge believes, after voir dire, that they cannot be impartial" [citation omitted]).  There was no error here.

c.  O'Brien's identification of the defendant.  The defendant argues that the admission of O'Brien's identification of the defendant as the man depicted in the surveillance video recording was improper, and that the error was compounded by the

---

[26] The selected jury were comprised of nine white jurors, one Asian juror, two Brazilian-Hispanic jurors, one Black juror, one juror who did not reveal race, and two for whom the office of jury commissioner lacked data on their race, but whom counsel noted to be white.

prosecutor's reference to the "distinctive braids" of the person in the video recording and the judge's identification instruction. The Commonwealth argues that the judge properly allowed O'Brien to identify the defendant in the surveillance footage, that the prosecutor never mentioned the identification in closing argument and appropriately responded to defense counsel's closing argument by mentioning the braids, and that the judge's instruction was proper.

Prior to trial, the defendant filed a motion in limine to exclude lay opinion testimony regarding the identity of persons in surveillance video recordings. This motion was denied as to O'Brien's identification of the persons in the recordings. The judge wrote:

> "I have reviewed the videos in question and find they are generally of good quality, but neither unmistakably clear nor hopelessly obscure. The appearances of the defendants as they will be seen in court are different than the appearances of the persons in the videos, where hats and hooded sweatshirts obscure some of the features. One of the defendants is wearing glasses in court and it is not clear that the persons in the video are wearing glasses. Finally, the Trooper's familiarity with the defendants based on his investigation of this matter is a factor weighing in favor of the admissibility of such an identification."

As mentioned supra, over objection, O'Brien identified the defendant in the surveillance video recording several times throughout the trial. Because the defendant objected to O'Brien's identification of the defendant at trial, we review

his identification testimony for prejudicial error.  Grier, 490 Mass. at 475-476.

As an expression of opinion, identifying a person from a video image "is admissible only where 'the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time.'" Commonwealth v. Wardsworth, 482 Mass. 454, 475 (2019), quoting Commonwealth v. Austin, 421 Mass. 357, 366 (1995).  The purpose of such lay witness testimony is to "assist the jurors in making their own independent identification." Wardsworth, supra, quoting Commonwealth v. Pina, 481 Mass. 413, 429 (2019).  "The general rule is that a witness's opinion concerning the identity of a person depicted in a surveillance photograph is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury."  Pina, supra at 429-430, quoting Commonwealth v. Vacher, 469 Mass. 425, 441 (2014).  In other words, these identifications are admissible "when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess."  Wardsworth, supra, quoting Vacher, supra.  "If the witness lacks such familiarity, it is the province of the jury to draw their own conclusions regarding the identity of the person depicted without the witness's assistance."  Wardsworth, supra, quoting Vacher, supra.

Here, as in Wardsworth, "the jury were able to view the same surveillance footage that [O'Brien] watched." Wardsworth, 482 Mass. at 475. Although they were not able to see photographs taken of the defendant the night of the murder, or the sweatshirt and hat that he presumably was wearing at the time of the crimes,[27] the jury were provided photographs from the stop at the drive-through that occurred a little over a day after the crimes and the defendant's booking photographs taken three days after the crimes. The only indications that the defendant's appearance changed between the time the video recording was made and the time of trial were statements from his counsel and the judge's decision on the motion in limine that he was wearing glasses at the time of trial. The defendant was not wearing glasses in the photographs taken close in time to the crimes that were provided to the jury. Although we recognize that O'Brien watched the video recordings numerous times during his investigation of this matter, and that he interacted with the defendant at the drive-through, he did not possess "sufficiently relevant familiarity with the defendant that the jury [could not] also possess." Wardsworth, supra,

---

[27] The Commonwealth introduced pants recovered from the defendant's home, which the prosecutor argued he wore during the crime.

quoting Vacher, 469 Mass. at 441.[28]  "The jury were capable of viewing the videotape and drawing their own conclusions regarding whether the man in the videotape was the defendant without the assistance of [O'Brien's] testimony."  Austin, 421 Mass. at 366.  Therefore, the admission of his lay testimony identifying the defendant in the video recording was error.

This error, however, does not require reversal.  We recognize that there is "increase[d] potential for inappropriate prejudice to the defendant stemming from identification testimony from a police officer who is so designated" (citation omitted).  Wardsworth, 482 Mass. at 476.  Nonetheless, we also have determined that no prejudice existed in specific circumstances where the evidence against the defendant was strong, where the identification was fleeting, or where the defendant admitted to being present at the scene.  Id.  See Austin, 421 Mass. at 366.

In this case, the defendant did not admit to being at the scene.  Despite this, where there was no indication that the defendant's appearance at trial markedly differed from his

---

[28] Here, O'Brien gained familiarity with the defendant through his repeated review of the video recording and one brief interaction with the defendant.  We limit our holding to these facts and express no opinion on whether a police officer could identify a defendant on a video recording or in a photograph if, for example, he specifically had surveilled a defendant over a longer period of time.

appearance in the video recording and in photographs taken after the crime, the jury were "capable of drawing the same conclusion" as O'Brien.[29] Vacher, 469 Mass. at 442. Contrary to the defendant's assertion, the jury saw the Burlington hotel video recording before O'Brien identified the defendant as one of the people in the recording.[30] Based on the photographs and the recording admitted, the jury could have found that the defendant resembled the individual on the recording. Although O'Brien mentioned his identification of the defendant in the recording approximately four or five times throughout his extensive testimony, no other witness was permitted to identify the defendant in the recordings. Contrast Wardsworth, 482 Mass. at 474 (four officers identified defendant in video footage, one pointing out similarity to defendant's clothing before jury saw video recording).

Further, although no other witness identified the defendant at the scene of the crime, the evidence against the defendant was strong. Aside from the similarity to the man in the video footage, on the day following the shooting, the defendant was in

---

[29] The video footage admitted was "neither '. . . unmistakably clear or . . . hopelessly obscure.'" Commonwealth v. Pleas, 49 Mass. App. Ct. 321, 325 (2000), quoting United States v. Jackman, 48 F.3d 1, 5 (1st Cir. 1995).

[30] The fact that O'Brien told the jury he watched the Saugus hotel video footage "dozens and dozens of times" does not alter our conclusion here, for the reasons stated infra.

the distinct car shown in the video recording.  The defendant lied to the officers about his whereabouts at the time of the crimes.  At 12:30 P.M. on July 2, 2015, after several messages were found on Jeune's cell phone regarding the murder, Jeune sent a text message to the defendant, "Ima kall u in a min.  Its on da news."[31]  There were repeated telephone calls between Jeune and the defendant in the days before, on the day of, and in the days following the murder.  The defendant was acutely aware of Jeune's new cell phone number after the murder:  on June 12, he gave an individual the 9575 number when asked for Jeune's cell phone number; on July 3, the day after the murder, he gave that same individual the 9096 number.  There was no outgoing activity on the defendant's cell phone on July 2 from 12:09 to 12:35 A.M.; the murder happened at approximately 12:20 A.M.  The CSLI placed both the defendant's cell phone and the cell phone with the 9575 number in Boston before and after the murder.  This evidence, connected with the abundance of evidence against Jeune, his joint venturer, supports our conclusion.  See Vacher, 469 Mass. at 442 ("The testimony, brief and fleeting as it was, did not overwhelm the other compelling, properly admitted evidence against the defendant"); Austin, 421 Mass. at 366 (admission of identification testimony not reversible error

---

[31] A minute later, Jeune sent a text message to "Mama Bear" that "[t]hey didn't even search the room yet."

where, in part, evidence pointing to defendant was "overwhelming").

Additionally, and most impactful to our determination that the admission of the testimony was not prejudicial, the judge gave several forceful instructions regarding O'Brien's identification of the defendant on the video recording. During O'Brien's testimony, the judge instructed the jury:

"You've heard some opinion evidence or testimony from this witness who has identified various people in the videos that you've seen from several hotels. That evidence, the opinion evidence was offered for whatever assistance it may provide to you in your own determinations in this case. You are not bound to accept that testimony and, indeed, you must make your own determinations as to what you see in those security videos. That is your determination and your determination alone. You may consider the testimony of Trooper O'Brien regarding the identity of those persons in the video, along with all of the other evidence, and you may give it whatever weight, if any, that you deem it is fairly entitled to receive, but you must remember that you must decide for yourselves what those security videos show you." (Emphases added.)

Again, as a part of his instructions to the jury at the close of evidence, the judge also gave an identification instruction, reminding the jury that an identification must be proved beyond a reasonable doubt. He specifically mentioned O'Brien in this instruction:

"As with any witness, you must determine the credibility of a witness identifying a defendant as a participant in the crimes charged. In this case, Trooper Sean O'Brien provided some identification evidence. If you conclude that he was not telling the truth regarding the identification of the persons in the security videos, you must disregard that testimony. If you conclude that he

intended to tell the truth, you must also consider the possibility that the witness made a good faith error in identification. That is, you should consider whether the witness could be honestly mistaken in his identification of the defendants" (emphasis added).

The judge then went on to discuss why people make mistakes in identification, listing factors that the jury should consider when determining whether the identification made by O'Brien was accurate. He also instructed the jury, "You may consider that the witness and the persons he identified are of different races. Research has shown that people of all races may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race." See Commonwealth v. Bastaldo, 472 Mass. 16, 18 (2015) ("cross-racial instruction should always be included when giving the model eyewitness identification instruction, unless the parties agree that there was no cross-racial identification"); Commonwealth v. Gomes, 470 Mass. 352, 382 (2015) (Appendix), S.C., 478 Mass. 1025 (2018) (appropriate to add jury instruction of this nature where witness and offender are of different races). He finished the identification instruction with more comments specific to O'Brien's identification:

> "In the end, you must determin[e] for yourselves what the security videos show you. You may give the identification testimony of Trooper O'Brien whatever weight you deem it is fairly entitled to receive. If you are not convinced beyond a reasonable doubt that a person was a person who committed or who participated in the commission of the crimes charged, that defendant must be found not guilty.

"Now, you heard testimony from Trooper O'Brien who identified persons that in his opinion were seen in security videos from several hotels.  That evidence was offered for whatever assistance, if any, that it provided to you in your determinations in this case.  You are not bound in any way to accept that testimony, and you must make your own determinations as to what you see in those security videos.  That is your determination and your determination alone.

"You may consider the testimony of Trooper O'Brien regarding the persons in the security videos, along with all of the other evidence, and you may give it whatever weight, if any, that you deem it is fairly entitled to receive.  But you must remember that you must decide for yourselves what those security videos show you."  (Emphases added.)

Assuming that the defendant preserved his objection to these identification instructions, they closely followed the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015).  Although O'Brien was not an "eyewitness" present at the scene of the crime, these instructions were appropriate where he was a lay witness identifying the defendant as someone he saw at the scene of the crime (albeit in a video recording of that scene).  Cf. Commonwealth v. Snyder, 475 Mass. 445, 455 n.24 (2016), citing Commonwealth v. Collins, 470 Mass. 255, 265 n.15 (2014), (distinction between identification by eyewitness at scene of crime and identification by eyewitness who observed defendant before or after crime); Commonwealth v. Johnson, 470 Mass. 389, 396 (2015) ("Because, here, there was no identification testimony that significantly incriminated the

defendant, the judge did not abuse his discretion in declining to give the modified identification instruction"); Commonwealth v. Williams, 58 Mass. App. Ct. 139, 143 (2003) (where eyewitness police officers identified defendant, "the jury should have been given the choice to conclude that the police officers had not lied, but were honestly mistaken in their identifications of the defendant"). The insistence of the judge, through these instructions, that the jury must determine the identity of the men in the video footage on their own commands our conclusion that the error in admitting this testimony did not prejudice the defendant. See Commonwealth v. Andrade, 468 Mass. 543, 549 (2014) ("The jury are presumed to follow the judge's instructions").

The prosecutor's repeated reference to the defendant's "distinctive braids" in closing argument does not alter our conclusion. Where the defendant did not object to this aspect of the prosecutor's closing, we review for a substantial likelihood of a miscarriage of justice. Commonwealth v. Moffat, 486 Mass. 193, 201 (2020). At the outset, it bears mention that the defendant's counsel referenced the braids of the individual in the video recording, although seemingly to suggest that they mean nothing in the context of the perpetrator being the defendant. See Commonwealth v. Fernandes, 478 Mass. 725, 741 (2018) (prosecutor entitled to point out weaknesses of

defendant's case and reply to defendant's closing argument).  In
Commonwealth v. Davis, 487 Mass. 448, 469 (2021), S.C., 491
Mass. 1011 (2023), we recognized that "braided hairstyles are
not uncommon among Black people," and pointed out that even if
there were evidence that the length of the defendant's hair were
similar to that of the perpetrator in the video recording, it
would have fallen short, in that particular case, of evidence
from which the jury could have identified the defendant as the
perpetrator in the recording.  Id. at 469 n.26.  As a result, we
held that it was improper for the Commonwealth to suggest that
the jury could identify the defendant based on the recording.
Id. at 469.

Here, although the video recordings from the various hotels
were not clear, they were not altogether "[low] enough
resolution [or] taken from too far away to be [un]able to
discern any features of the [defendant's] face," unlike the
video recording in Davis, 487 Mass. at 469.  On at least two of
the recordings, a conscientious observer can see that the
individual alleged to be the defendant has a small amount of
facial hair, and the individual's face is visible for a short
period of time, particularly in the Saugus video recording.[32]  In
each of the recordings, the individual's chin-length, single

_____

[32] In the booking photographs of the defendant, he has a
small amount of facial hair on his chin and a mustache.

braids are visible.  This comported with the testimony of the defendant's former girlfriend, who said that at the time, she braided the defendant's single, "unattached," chin-length braids, and the booking photographs of the defendant, which clearly depict the same style of braids.  Further, the prosecutor did not only focus on the braids of the person in the video recordings but also pointed out the individual's build and the "tapered" cargo pants similar to those recovered by police from the defendant's home.  Because the video recordings were of sufficient quality to discern other features of the individual depicted, the prosecutor did not err in her repeated references to the similarity of the braids to those of the defendant.

Finally, in closing argument, the prosecutor never relied on O'Brien's identification of the defendant in the surveillance video recordings.[33]  Rather, the prosecutor implored the jury to

---

[33] The closest the prosecutor came to discussing the identification testimony was:

"You see [the defendant's] build and, yes, you see the tapered pant leg of the cargo pants described by . . . O'Brien as what he observed in that videotape. . . .

". . .

"In this case, you also have the benefit of very good video showing [the defendant] walking through at Saugus, as well as at Woburn, as well as the [hotel] in Burlington, that all show his stride in his walk.  And I'd ask you to look carefully at that because it bears out the description given by . . . O'Brien, as well as the type of pants that police recovered from his home."

compare the photographs in evidence of the defendant with the individual seen in the video recordings to make their own identification, paying attention to the defendant's "unique appearance."  This, as well, contributes to our determination that the defendant was not prejudiced by the improper testimony.

d.  Sufficiency of evidence for felony-murder.  The defendant argues that the evidence supporting his conviction of murder in the first degree was insufficient in the wake of Commonwealth v. Brown, 477 Mass. 805 (2017), cert. denied, 139 S. Ct. 54 (2018).[34]  In our review of the denial of a motion for a required finding of not guilty, "we consider the evidence introduced at trial in the light most favorable to the Commonwealth, and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Oberle, 476 Mass. at 547.

In Brown, a majority of the court held that:

"a defendant who commits an armed robbery as a joint venturer will be found guilty of murder where a killing was committed in the course of that robbery if he or she knowingly participated in the killing with the intent required to commit it -- that is, with the intent either to kill, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result" (emphasis added).

---

[34] The defendant's trial commenced after this court's holding in Brown, 477 Mass. 805.

Brown, 477 Mass. at 832 (Gants, C.J., concurring).  In doing so, the court limited the scope of felony-murder "to its statutory role under G. L. c. 265, § 1, as an aggravating element of murder" where the killing occurs "in the course of a felony punishable by life imprisonment."  Id. at 807.  This "eliminated the theory of proof of criminal intent by constructive malice." Commonwealth v. Dawson, 490 Mass. 521, 531 (2022).

Where, as in Brown, the predicate felony was attempted armed robbery, "the Commonwealth also was required to prove that the defendant knew that one of his accomplices possessed a firearm."  Brown, 477 Mass. at 812.  "Knowing participation in a criminal offense 'may take any of several forms,' and includes providing 'aid or assistance in committing the crime.'"  Id. at 812-813, quoting Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix).

Attempted armed robbery is a proper underlying felony to support a conviction of murder in the first degree based on a theory of felony-murder.  Commonwealth v. Quiles, 488 Mass. 298, 306 (2021), cert. denied, 142 S. Ct. 1237 (2022).  "An attempt is defined as (1) an intent to commit the underlying crime and (2) an overt act towards its commission."  Id. at 308, quoting Brown, 477 Mass. at 812 n.5.[35]

---

[35] To support an armed robbery conviction as part of a joint venture, the Commonwealth must prove "that the defendant was

The evidence formed a foundation for the jury to conclude beyond a reasonable doubt that the defendant, knowing Jeune was armed with a firearm, went to the Burlington hotel with the intent to rob Johnson at gunpoint.[36]  After the defendant participated in the robbery of Emily, during which he knocked on her door to gain entry and took her money and belongings while Jeune held a gun to her head, at least at that point, he would have been aware that Jeune had a firearm and was prepared to use it to carry out the robbery of Johnson.  Indeed, the jury's verdict acknowledged as much where the jury convicted the defendant of murder in the first degree of Johnson, but acquitted him on unlawful possession of a firearm, home invasion, and armed assault in a dwelling, and convicted him of the lesser included offense of unarmed robbery of Emily.  "Even if the defendant had been unaware that [Jeune] possessed a weapon in advance, it would be reasonable to conclude that he became aware over the course of the" robbery of Emily, "and continued to participate" in the attempted robbery of Johnson,

part of a venture in which at least one of the coventurers was armed with a dangerous weapon, either applied violence to the victim['s] bod[y] or put [her] in fear, and took the victim['s] property with the intent to steal it."  Commonwealth v. Rakes, 478 Mass. 22, 33 (2017).

[36] In so holding, we rely on our conclusion that the evidence was sufficient for the jury to identify the defendant as the man with the braids.

"implicating him in the joint venture." Commonwealth v. Rakes, 478 Mass. 22, 33 (2017). See Commonwealth v. Eagles, 491 Mass. 210, 219 (2023) (defendant's continued participation in robbery after learning of coventurer's use of weapon, combined with his failure to render aid to victim, telephone 911, or disassociate himself from coventurer, demonstrated necessary intent for armed robbery); Commonwealth v. Phap Buth, 480 Mass. 113, 117, cert. denied, 139 S. Ct. 607 (2018) ("Where a defendant continues to act in furtherance of the joint venture even after learning of a coventurer's weapon, we have allowed an inference that the coventurer had the requisite intent for the joint venture").

We reject the defendant's contention that the jury could not have found that he carried out "an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result" because there was no evidence that he knew Jeune's gun was loaded or functional, or that he believed Jeune would fire the gun.[37]  Brown, 477 Mass. at 832 (Gants, C.J., concurring).  "Absent proof that the defendant himself was armed, proof that he knew his coventurer to be armed suffices to satisfy the standard" for attempted armed robbery.  Rakes, 478 Mass. at 33.  "Where an unarmed felon knows that his accomplice

---

[37] "The Commonwealth was not required to prove who shot the victim."  Commonwealth v. Housen, 458 Mass. 702, 708 (2011).

in a robbery is carrying a gun, even if he believes the gun is unloaded and his accomplice has no ammunition, that robbery is inherently dangerous to human life." Commonwealth v. Carter, 396 Mass. 234, 237 (1985). Even if a gun were unloaded, its use "may provoke violent resistance from the intended victim or may spur others, such as police officers, to intervene with deadly force." Id.

During the robbery of Emily, while the defendant was in the room with Emily and Jeune and standing to the left of Jeune, Jeune said to Emily, "If you scream, believe me, I can scream louder." From this, the jury could infer that the defendant was aware that Jeune was willing to discharge the weapon if necessary to ensure the compliance of their victims. Notwithstanding this awareness, the defendant continued to participate in the robbery of Emily, and then the attempted robbery of Johnson. That Jeune did not fire the gun during the incident involving Sarah (where they were not able to enter her room) or the robbery of Emily (where Emily complied with their demands) does not convince us otherwise. Although we acknowledge, after Brown, 477 Mass. at 835 (Gants, C.J., concurring), that not every killing committed in the course of a life felony would constitute felony-murder, the defendant's participation in this case does, because in attempting to rob Johnson after the robbery of Emily, he committed "an act which,

in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result." Id. at 832 (Gants, C.J., concurring).

That the defendant and Jeune did not take Johnson's money after the shooting also does not alter our conclusion, where it is the defendant's intent before the shooting, not after, that is relevant, and where their failure to take the money may have been attributable to their desire to distance themselves from the scene of the crime as expeditiously as possible. That Johnson did not act as submissively as they might have hoped does not alter their intent on entry to her room. We disagree with the defendant that the evidence "suggests Jeune did not intend to shoot Johnson." The loud bang was heard by guests of the Burlington hotel after they heard a woman yelling for help, and Johnson was discovered with the telephone cord stretched out under her body with blood smears by the telephone, suggesting that Johnson was killed to keep her quiet.

We also reject the defendant's contention that the defendant could not have anticipated the shooting because "the robbers targeted sex workers in hotels because they were trying to avoid resistance, violence, and attention."[38] To begin, it does not inure to the defendant's benefit that he chose victims

---

[38] The defendant's trial counsel made a similar argument in closing.

whom he thought were particularly vulnerable. Doing so does not support an argument that he was at all concerned about harming the victims. In any event, that the victims were working as escorts equally could have supported an inference that they would be armed in preparation for any conflict that might arise in the course of their work. See Phap Buth, 480 Mass. at 117 n.7 (where defendant argued that victims' characteristics supported inference that defendant would not expect coventurers to be armed based on need to overcome victim resistance, victims' physical characteristics equally supported inference that they would be armed).

Last, the defendant urges that fundamental principles of criminal law surrounding proportionality of criminal liability to moral culpability require a determination that an accomplice must be subjectively aware that his coventurer's actions create a plain and strong likelihood of death. "We consistently have rejected the argument that the felony-murder rule is unconstitutional, . . . or that it relieves the Commonwealth of its obligation to prove a defendant's own moral culpability." Brown, 477 Mass. at 823.[39] As we held in Brown, supra: "We

---

[39] The cases of Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987), cited by the defendant in support, are inapposite. In Enmund, supra at 797, the United States Supreme Court held that the Eighth Amendment to the Federal Constitution did not permit the imposition of the death penalty on a defendant who did not himself kill, attempt to

discern no reason . . . to accept the defendant's invitation that we abolish the felony-murder rule."[40]

e. _Jury instructions_. During deliberations, the judge received a question from the jury regarding his felony-murder jury instructions. The jury asked whether "intended to do an act" referred to "attempted armed robbery or the discharge of a firearm." In the discussions with the judge regarding an appropriate answer, defense counsel acknowledged that depending on "[the] circumstance[s] in which an attempted armed robbery is occurring, [it] may meet third prong malice" for the purposes of felony-murder under _Brown_. Nonetheless, he asked that the judge instruct the jury that "attempted armed robbery cannot be, in and of itself . . . the intended act described in element 4(c),"

---

kill, or intend that a killing take place in his commission of a felony. In so holding, the Court focused on the severity of the death penalty. _Id_. In _Tison_, _supra_ at 154, the Court determined that there was an "apparent consensus that substantial participation in a violent felony [in] circumstances likely to result in the loss of innocent human life may justify the death penalty even absent an 'intent to kill.'" The Court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the _Enmund_ culpability requirement." _Id_. at 158. As both _Enmund_ and _Tison_ focused on the imposition of the death penalty, neither case is pertinent here.

[40] Therefore, the jury instruction given by the judge on third prong malice, which the defendant admits tracked the Model Jury Instructions on Homicide, was accurate.

and that in this case the "act" would be the discharge of a firearm.[41]  The judge's written response to the jury provided:

> "You must determine separately for each defendant from the totality of the circumstances which you find occurred whether what occurred constitutes an intent to do an act which in the circumstances known to the defendant a reasonable person would have known created a plain and strong likelihood that death would occur."[42]

The defendant argues that this instruction was insufficient following Brown, building on his argument that a defendant's intent to commit an armed robbery alone could not establish a plain and strong likelihood of death, and that the only

---

[41] "Element 4(c)" refers to a portion of the felony-murder model jury instruction:

"To prove the defendant guilty of felony-murder in the first degree, the Commonwealth must prove the following elements beyond a reasonable doubt:

". . .

"4.  The defendant:

". . .

"c.  intended to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result."

Model Jury Instructions on Homicide 59-60 (2018).

[42] After hearing the written instruction, defense counsel asked whether the judge could include "at the moment of the discharge of the firearm."  The judge declined to do so but noted counsel's objection.

intentional act that could have supported his conviction was the act of shooting Johnson. The defendant's argument is misplaced.

In Brown, contrary to the defendant's contentions, the court did not hold that an armed robbery could never be the act supporting a finding of third prong malice. Rather, the court held that commission of the crime of armed robbery (or attempted armed robbery), in and of itself, is no longer sufficient to uphold a conviction of felony-murder; one must look to the circumstances known to the defendant at the time he committed such an "act." Brown, 477 Mass. at 832 (Gants, C.J., concurring). The court did not define "act" further. Analyzing Brown, the "act" could be the shooting of a gun. The "act" could also reasonably be the commission of a dangerous attempted armed robbery, which a reasonable person would have known created a plain and strong likelihood that death would occur. As discussed supra, the evidence supported the jury's conclusion that the defendant's actions throughout his participation in the attempts to rob Sarah, Emily, and Johnson supported the malice prong. There was no error.

The defendant further argues that the judge inappropriately instructed the jury:

> "[A]s a general rule you are permitted but not required to infer that a person who intentionally uses a dangerous weapon on another person intends to kill that person or to cause that person grievous bodily harm or intends to do an act which in the circumstances known to him a reasonable

person would know creates a plain and strong likelihood that death would result."

This instruction comports with the supplemental instructions in the Model Jury Instructions on Homicide 105 (2018). The defendant argues that because there was no evidence that the defendant knew the gun was loaded or that Jeune intended to shoot Johnson, the inference that the defendant acted with malice based on his knowledge of Jeune's use of a gun was impermissible. He relies on Commonwealth v. Colas, 486 Mass. 831 (2021), in making this argument.

In Colas, 486 Mass. at 835, during a confrontation between two groups, the defendant raised his hand and pointed a gun toward another man. In response, that man fired four or five shots at the defendant, striking two bystanders, one of whom was killed. Id. In the unique circumstances of Colas, the court held that the defendant's pointing of a gun at the man who fired his gun in return did not support the jury instruction mentioned supra, because it was not "a typical case involving someone alleged to have shot, stabbed, or clubbed a victim." Id. at 843. Colas is not helpful to the defendant because the evidence suggested, as discussed supra, that Johnson was shot

intentionally as part of the joint venture.  This instruction
was given properly to the jury.[43]

f.  <u>Closing argument</u>.  The defendant takes issue with the
prosecutor's pattern in closing argument of referencing items
that were used in the crimes as used and possessed by both
coventurers.  He points to the following sentences in the
Commonwealth's closing argument:

> "They came with a firearm, a weapon.  They had ammunition
> for that weapon. . . .
>
> "They had a cell phone, . . . that had no subscriber. . . .
> They had a smart phone, the Alcatel, that was found in
> . . . Jeune's car. . . .
>
> "They also had a car, a Toyota Camry, . . . with a
> different color front passenger side quarter panel, a
> missing rear hubcap, a different color gas door opener, and
> a sunroof. . . .
>
> "[T]hey had ammunition for a handgun, .380 caliber class
> ammunition, consistent with the bullet that killed . . .
> Johnson, that was found in the backseat of a Jeep in the
> driveway at . . . Jeune's house."

Where the defendant objected to the prosecutor's repeated use of
the word "they" at trial, we review for prejudicial error.
<u>Commonwealth</u> v. <u>Durand</u>, 475 Mass. 657, 670 (2016), cert. denied,
583 U.S. 896 (2017).

---

[43] In the absence of any evidence that the murder of Johnson
was an accident, the defendant was not entitled to an
instruction on accident.  See <u>Commonwealth</u> v. <u>Podkowka</u>, 445
Mass. 692, 699 (2006) ("Where there is no evidence of accident,
the issue is not fairly raised and the judge need not give an
accident instruction").

"Under our case law, '[w]hile prosecutors are entitled to argue "forcefully for the defendant's conviction," closing arguments must be limited to facts in evidence and the fair inferences that may be drawn from those facts.'" Commonwealth v. Alvarez, 480 Mass. 299, 305 (2018), quoting Commonwealth v. Rutherford, 476 Mass. 639, 643 (2017).  We examine all the statements challenged by the defendant "in the context of the entire closing, the jury instructions, and the evidence introduced at trial."  Commonwealth v. Kapaia, 490 Mass. 787, 801 (2022), quoting Commonwealth v. Cheng Sun, 490 Mass. 196, 217 (2022).  "Although 'counsel may argue the evidence and the fair inferences which can be drawn from the evidence,' . . . 'a prosecutor should not . . . misstate the evidence or refer to facts not in evidence.'"  Kapaia, supra at 804, quoting Cheng Sun, supra at 221.

There was no error in the Commonwealth's use of the word "they" in the above statements.  The evidence demonstrated that as the defendant and Jeune carried out their scheme, they used a firearm to subdue their victims.  That firearm evidently contained ammunition with which they shot Johnson, and the class of ammunition found in Jeune's Jeep could have been used to kill Johnson.  Although the statement about the ammunition in Jeune's Jeep is a close call, we think the evidence supported the prosecutor's statement.  It is irrelevant that there was no

specific evidence that the firearm used during the joint venture was in the hands of the defendant. As the two men used a firearm to further the joint venture, the prosecutor's statements were accurate. Similarly, the cell phone with no identified subscriber was used to contact the victims, and the Alcatel number was used to visit Backpage and communicate with the defendant's cell phone about the crime. The Camry was used to drive the defendant and Jeune to each of the crime scenes. There need not be evidence regarding the defendant's personal use of these devices and the Camry to attribute the items to him throughout the joint venture. "Acts of a joint venturer amounting to consciousness of guilt may be attributed to another joint venturer if the acts occurred during the course of a joint venture and in furtherance of it." Wardsworth, 482 Mass. at 463 n.16, quoting Commonwealth v. Mahoney, 405 Mass. 326, 330-331 (1989). See Commonwealth v. Braley, 449 Mass. 316, 321-322 (2007) (actions of joint venturer in disposing of his rifle, fleeing, and painting his truck attributable to defendant because they were done in furtherance of continuing joint venture).

Even if we did hold that the statements were error, any error did not prejudice the defendant. These statements were spread out over a span of eight pages of transcript in a closing argument that spanned over thirty pages. Additionally, the

judge instructed the jury that closing arguments are not evidence on two separate occasions and explained that he did not allow the jurors to have their notebooks during closing arguments for that reason.  See Commonwealth v. Lester, 486 Mass. 239, 249 (2020) (judge's instructions that closing arguments not evidence mitigated error where misstatements were thirteen words of thirty-three page argument).

g.  Review under G. L. c. 278, § 33E.  Finally, we have reviewed the entire record of this case pursuant to G. L. c. 278, § 33E, including but not limited to the remainder of the issues in the defendant's motions to suppress, the admission of the Saugus video recording and Sarah's testimony, the defendant's past gun possession as a prior bad act, and the judge's admission of the grand jury testimony of the defendant's former girlfriend where the judge found she was feigning memory loss.  We conclude that there is no reason to reduce the defendant's sentence on his conviction of murder or to order a new trial.

This is not a case such as Brown, 477 Mass. at 824, where the defendant was involved in the "remote outer fringes" of the attempted armed robbery, robbery, and murder.  The defendant went to three different hotels in what the evidence showed to be a planned effort to rob escorts at gunpoint with Jeune.  It does not move us that Emily testified that the man who did not have

the gun was "empathetic" to her.  As Jeune kept the gun trained on Emily, the defendant ransacked her room, grabbing her money, wallet, and marijuana, continuing after Jeune threatened to hurt Emily if she did not keep quiet.  After the defendant participated in this violent encounter, he went to the Burlington hotel to do it again, and he was present when the shot was fired that killed Johnson.  After Johnson was killed, he fled the hotel with Jeune and quickly left in the Camry.  See Commonwealth v. Tillis, 486 Mass. 497, 509 (2020) (defendant played central role where he identified drug dealer to target, coordinated with accomplice, planned robbery, and entered apartment building with knife, despite disparity in sentence for more culpable accomplice).

Judgments affirmed.